The UNITED STATES of America, and the People of the State of Washington, Plaintiffs,

and

The Standard Equipment Company, Inc., Plaintiff in Intervention,

v.

The WESTERN PROCESSING COMPANY, INC., et al., Defendants.

No. C83–252M.

United States District Court, W.D. Washington, at Seattle.

April 3, 1990.

Leslie Allen, Asst. Atty. Gen., Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., and Laurie Sillers Halvorson, Asst. Atty. Gen., State of Wash., Temple of Justice, Olympia, Wash., for plaintiffs.

Victoria Bjorkman, Hugh Davis and Lawrence Hard, LeSourd & Patten, Seattle, Wash., for Unocal.

Ted Millan, Seattle, Wash., for RSR Corp.

Jack Fox and Bill Blakely, E.P.A., for other defendants.

## ORDER GRANTING THE GOVERNMENTS PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF LIABILITY

McGOVERN, District Judge.

The Governments move for partial summary judgment asking the Court to find that Defendants Garmt J. Nieuwenhuis, Western Processing Company, RSR Corporation (RSR), and Union Oil of California (Unocal) are liable parties under Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C.S. § 9607(a). By Order entered October 26, 1989, this enforcement action was bifurcated into the Liability Phase and the Damages Phase. The issue of the amount of damages (response costs) is left to a subsequent stage of this litigation against the four nonsettling defendants. Additionally, it should be noted that the Governments are not now moving for summary judgment on Defendants' affirmative defenses (related to, *e.g.*, the Resource Conservation and Recovery Act, The Clean Water Act, and the Model Toxics Control Act, R.C.W. 70.105D.010 et seq.)

All defendants resist the motion, and Nieuwenhuis, Western Processing, and RSR have filed cross-motions for summary judg-

ment asking that the Court declare the Governments liable under CERCLA § 107.

## THE GOVERNMENTS' ARGUMENT

The Governments have submitted a comprehensive and thorough argument of the issues in their opening brief. These arguments will not be summarized, but will be referred to as Defendants' arguments are addressed.

The Governments submit that liability under CERCLA is simple and straightforward, 42 U.S.C. § 9607 requiring that the Governments show:

(1) that there was a release or threatened release of a hazardous substance,

(2) from a facility,

(3) which release caused the governments to incur some amount of response costs,

(4) and that the defendant falls within one of the classes of potentially liable parties delineated by the statute. (Generator, transporter, owner, or operator of a facility.)

## UNOCAL'S ARGUMENT

Unocal admits all but element three as follows: that there has been a "release" of a hazardous substance (not necessarily arsenic) at the Western Processing Site, a "facility," and that Unocal generated a hazardous substance (arsenic) and arranged for the disposal and treatment of it at Western Processing. Unocal lodges a proposed order citing these admissions but denying partial summary judgment on liability on the basis of material issues of fact under the following categories:

(1) Whether recovery against Unocal is barred by the third-party conduct defense of 42 U.S.C. § 9607(b)(3);

(2) Whether the Court should apportion any liability on the basis of the Gore Factors;

(3) Whether plaintiffs already have recovered all legitimate response costs; and

(4) Whether recovery against Unocal is barred by the equitable defense of unclean hands.

Unocal contends that its waste is not the source of arsenic contamination at Western Processing, and that all detectable arsenic contamination is the result of third-party conduct. This is the third-party conduct defense under 42 U.S.C. § 9607(b):

There shall be no liability under [42 U.S.C. § 9607(a)] for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by—

.     .     .     .     .

(3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant ... if the defendant establishes by a preponderance of the evidence u. ꞇ (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions....

The elevated arsenic levels at the site are attributable to two principal sources under Unocal's analysis: (1) arsenic trioxide purchased by Western Processing Company for manufacturing wood preservative in the early 1970s; and (2) battery chips sent to the Western Processing site as waste by RSR Corporation in the early 1980s. Battery chips are crushed battery casings that still contain small amounts of battery lead. Unocal contends that the battery lead also contained arsenic as the composition of the battery lead alloy made in the 1950s and 1960s contained arsenic and antimony. Unocal also theorizes that coal dust was used as a filler in hard rubber battery casings, that virtually all coal dust contains arsenic; that Appalachian coal (the likeliest

source) "may contain sufficient arsenic to account for the arsenic concentrations found in certain EPA samples that contain battery chips." (Unocal brief at 15.)

The vast bulk of Unocal's waste shipped to Western Processing was oxazolidone, which is not a hazardous substance, but it contained tiny amounts of arsenic which is listed as a hazardous substance. Unocal contends that most of the arsenic concentrations in samples do not exceed background levels, levels of arsenic naturally occurring in the soil, and that the highest concentrations were in locations that indicate a link to sources other than Unocal's oxazolidone. Unocal presents a thorough analysis of the arsenic content of battery lead, casings, and chips; Western Processing's manufacture of the saleable product lead chromate on the site from the battery waste; the correlation of arsenic with lead and antimony. It then goes on to analyze the arsenic concentrations found in various soil samples taken by the EPA and submits that every concentration of arsenic in excess of background levels is attributable to sources other than oxazolidone.

Unocal asserts that "only a handful" of the soil samples exceeded background levels for arsenic, and only one on-site groundwater sample exceeded the drinking water standard. Unocal asserts that it has demonstrated the likely source or sources of the arsenic. Either no quantifiable oxazolidone, or oxazolidone in amounts so low that any potentially related arsenic would be far below detection limits, was found at these locations. None of these samples contained any detectable amount of arsenic from Unocal's waste.

Oxazolidone is a degradation by-product, generated at Unocal's Chemical Division plant in Kenai, Alaska, resulting from conversion of certain gases into ammonia. In 1974, sodium arsenite was added to the process as a corrosion inhibitor and began to appear in the residual oxazolidone in concentrations of .5 to 250 parts per million, the lesser concentrations occurring in later years. Oxazolidone occurs as a thick, yellow-brown liquid of very high viscosity.

From Unocal's analysis of test samples, the location of battery chip waste, and Western Processing's manufacturing process using the battery chip waste, Unocal argues that there was no release giving rise to liability, as oxazolidone is not a hazardous substance and the arsenic content was too minuscule to cause the plaintiff to incur response costs consistent with the National Contingency Plan. "[T]he National Contingency Plan is a means to assure that response actions are both cost-effective and environmentally sound...." *Jones v. Inmont Corp.*, 584 F.Supp. 1425, 1430 (S.D.Ohio 1984). An insubstantial release cannot cause the incurrence of response costs because the incurrence of such costs would not be "appropriate" under the NCP.

It should be noted that in *Jones* the Court also said:

> We agree with the district court in [*City of Philadelphia v.*] *Stephan Chemical* [*Co.*, 544 F.Supp. 1135 (E.D. Pa.1982)] that the national contingency plan is a means to assure that response actions are both cost-effective and environmentally sound and that, therefore, consistency with that plan goes more to the recoverability of various items of damages than to the existence of a claim for relief under the act. 544 F.Supp. 1144, n. 16.

*Jones*, 584 F.Supp. at 1430.

Unocal also cites *O'Neil v. Picillo*, 682 F.Supp. 706, 724 (D.R.I.1988), *aff'd in part*, 883 F.2d 176 (1st Cir.1989), and quotes the trial court:

> In all of 1977, this defendant had a total of 28 barrels of its sodium aluminum hydride waste delivered to ... a transporter for disposal. Twenty-one of these barrels were found at the site in question. The testimony is quite clear that nineteen of the barrels were intact, i.e., not leaking, and that two had pin holes which caused minuscule leaking of a few drops.... And the testimony established that "emission through small 'pinhole' leaks and drop quantities would result in evaporation so quickly that it could not pose any threat."

The trial court concluded that this could not be regarded as a release giving rise to liability under CERCLA, but held that defendant jointly and severally liable based on a *threat* of release. Unocal argues that this finding would have been erroneous under the First Circuit's opinion if this party had appealed, but in any event could not have been held liable for costs beyond the costs of removal of the barrels because the threat of release did not cause any actual environmental harm. (Unocal brief at 49.)

On this point, this Court notes what the First Circuit did say:

> The district court's statements concerning the waste attributable to each appellant were based on the testimony of John Leo, an engineer hired by the state to oversee the cleanup. We have reviewed Mr. Leo's testimony carefully. Having done so, we think it inescapably clear that the district court did not mean to suggest that appellants had contributed only 49 and 10 barrels respectively, but rather, that those amounts were all that could be *positively attributed* to appellants.

883 F.2d at 182 (emphasis in original). Three to four hundred out of approximately 10,000 barrels had no traceable markings, exposure to the elements had resulted in leaking, and there had been an enormous fire at the site. The Court went on:

> In light of the fact that most of the waste could not be identified, and that the appellants, and not the government, had the burden to account for all of this uncertainty, we think it plain that the district court did not err in holding them jointly and severally liable for the state's past removal costs.

*Id.* As to future liability, the district court held appellants jointly and severally liable for all further removal costs taken by the state, as well as for all necessary remedial actions, and the First Circuit affirmed. *Id.* at 183. The Circuit suggested that the appellants should move on to their contribution action where the District Court would be free to use any combination of equitable factors it deemed appropriate in allocating responsibility.

> Indeed, there might be no reason for the district court to place any burden on appellants. If the defendants in that action also cannot demonstrate that they were limited contributors, it is not apparent why all of the parties could not be held jointly and severally liable.

*Id.*

Unocal argues similarly to the defendant with the leaking barrels in *O'Neil* that as a consenting defendant under the Phase I Consent Decree, it has paid for removal of all stored oxazolidone from the Western Processing site. The total cost of oxazolidone removal, both initial and Phase I, was about $435,371.47, while Unocal's total contribution is $591,822. Thus, even if Unocal is liable on the basis of a threat of a release of arsenic, liability is limited to the cost of the removal of the oxazolidone. Unocal cites *O'Neil* arguing that removal costs are divisible if a particular defendant's waste is identifiable; *i.e.*, a defendant should not be held responsible for costs attributable to others. The *O'Neil* Court did not accept the EPA's argument that it is irrelevant that the costs of *removal* can be apportioned, "that the harm to be apportioned is not the cost but the environmental contamination that prompts the response action." 883 F.2d at 180.

In addition to the third-party conduct argument set forth above, Unocal also argues that even if the Court finds Unocal liable, it should apportion liability according to the Gore Factors, criteria known by the name of the sponsor of an amendment to the original 1980 CERCLA bill. The amendment would have provided factors on which to disallow imposition of joint and several liability in appropriate cases. The amendment failed, ultimately, and no reference is made in the statute to joint and several liability. The Gore Factors are as follows:

(1) The ability of the parties to demonstrate that their contribution to a discharge, release, or disposal of a hazardous waste can be distinguished;

(2) The amount of the hazardous waste involved;

(3) The degree of toxicity of the hazardous waste involved;

(4) The degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;

(5) The degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and

(6) The degree of cooperation by the parties with Federal, State or local officials to prevent any harm to the public health or the environment.

*Allied Corp. v. Acme Solvents Reclaiming, Inc.*, 691 F.Supp. at 1116–17. Unocal argues that it can distinguish its own waste—the arsenic contaminated oxazolidone, the amount of arsenic therein was small and the degree of contamination from the waste is minuscule and not relevant to EPA's incurrence of response costs, Unocal exercised due care in selecting a disposal facility, and has cooperated as fully as possible with the Plaintiffs, taking a leadership role in the establishment of the Phase I Consent Decree.

Unocal's third argument is that the Governments have not shown that they have incurred response costs in excess of amounts obtained through settlement. By virtue of the Phase II Consent Decree, Plaintiffs no longer incur direct response costs, and they have submitted no evidence that they are currently incurring response costs in connection with the site.

Unocal's fourth argument is that Plaintiffs actively promoted the Western Processing site despite knowledge of the facility's inadequacies, and that the United States as a former site operator caused the incurrence of response costs for which they now seek recovery. Unocal argues that the equitable defense of "unclean hands" is available in a cost recovery action on two bases.

One, the common law: "[t]he legislative history evinces the intent that the scope of liability under CERCLA, 42 U.S.C. § 9607, be determined from traditional and evolving principles of common law ...," *United States v. Chem–Dyne Corp.*, 572 F.Supp. 802, 808 (S.D.Ohio 1983). Unocal cites *United States v. Conservation Chemical Co.*, 619 F.Supp. 162, 206 (W.D.Mo.1985) holding that unclean hands may be asserted in a Section 107 CERCLA action even against the United States.

Two, CERCLA Section 106(a) provides that a court may "grant such relief as the public interest and the equities may require." The *Conservation Chemical* court concluded:

As equitable defenses are appropriate under Section 106 and the same standard of liability and associated defenses apply to Section 107, equitable defenses should be available under Section 107 also.

*Id.* at 205.

Finally, Unocal asserts that while it has microfilmed approximately 170,000 pages of documents produced by EPA, it has still not been allowed to photocopy or microfilm documents for which the EPA asserts a privilege and has not provided certain relevant photographs nor adequate cost documentation previously promised. Unocal brief at 98, Affidavits of Bjorkman and Clevenger. Moreover, Unocal contends that it has not had adequate time for discovery prior to this motion; to prepare adequately would have required counsel to read and analyze approximately 1,000 pages per day.

## THE GOVERNMENTS' REPLY

The Governments maintain that the Court should find Unocal strictly, jointly, and severally liable as they have not addressed any of the defenses raised in their answers, have essentially admitted all elements for liability under Section 107(a), and their arguments muddy the liability scheme, distort the elements of liability, confuse the issues of joint and several liability with contribution and allocation, misconstrue the third-party defense, and improperly assert the unclean hands defense.

While Unocal has not specifically admitted that arsenic has been found at the site

936

or that the Governments have incurred costs responding to the releases at the site, its memorandum is replete with references to the arsenic that has been detected there as well as various hypotheses regarding how the releases may have occurred. Moreover, this Court has already determined that there were releases of hazardous substances at the site, including arsenic, when it granted EPA's request for an injunction against the continued operation of Western Processing on July 14, 1983. Also, Unocal repeatedly refers to sampling and analyses performed by government contractors at the site and cannot seriously dispute that the Governments have incurred *some* response costs at Western Processing.

The Governments summarize Unocal's theory as follows:

> Essentially Unocal asserts that it contributed too minute an amount of arsenic to the site (in comparison to other sources) for liability to attach under Section 107; that Unocal's arsenic did not specifically cause the governments to incur any response costs; that it would be inappropriate for the governments to clean up Western Processing solely on the basis of the amount of arsenic that Unocal sent to the site, and, thus, that any costs the governments might attribute to Unocal would be *de facto* inconsistent with the NCP. While these notions might be appealing, they simply are not the law, and courts have vigorously rejected attempts to cloud CERCLA's straightforward statutory liability scheme.

(Governments' Reply at 5) The concentration or amount of hazardous substance is irrelevant as the statutory definition contains no threshold requirement. "[t]he plain statutory language fails to impose any quantitative requirement on the term hazardous substance, and we decline to imply that any is necessary." *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664 (5th Cir.1989); additional citations are omitted. The EPA's position is stated in the preamble to the final rule amending the National Priority List: "if the substance involved at a site is a 'hazardous substance,' the Agency can respond to any release, or any threatened release, without any need to determine that a threshold level of hazard is present." 49 Fed.Reg. 37075 (Sept. 21, 1984). EPA's construction should be given deference as a reasonable agency interpretation.

Neither does the statutory definition of "release" contain a threshold requirement. A "release" is *"any* spilling, leaking, etc." 42 U.S.C. § 9601(22) (emphasis added). The Government need not prove that Unocal's release was above background levels at a site; as one district court judge observed, the Governments "need not establish a release at all. A 'threatened release' is sufficient." *United States v. Mirabile*, 15 Envtl.L.Rep. (Envtl.L.Inst.) 20,992, 20993, 1985 WL 97 (E.D.Pa. Sept. 4, 1985); 42 U.S.C. § 9607(a). The principle of *"de minimis non curat lex"* (the law does not concern itself with trifles) is simply not a defense to CERCLA liability. Moreover, the Governments point out that "given the high concentrations of oxazolidone that have been found at the site, it is likely that substantial amounts of arsenic-laden oxazolidone were in fact spilled or otherwise released at the site"; 127,830 gallons of oxazolidone unaccounted for. (Plaintiffs' Reply at 13)

While the Governments are able to "fingerprint" Unocal's waste, it being the only generator to produce oxazolidone that was disposed of at Western Processing, and there being releases of oxazolidone at the site, there had to be a corresponding release of arsenic; the Governments need not prove that as to each generator of hazardous waste in a multi-defendant case, response costs were incurred. CERCLA looks to whether Unocal's arsenic was in the chemical soup found at Western Processing, and whether the governments incurred costs in investigating and/or cleaning up that soup. *E.g., United States v. Stringfellow*, 661 F.Supp. 1053, 1059 (C.D. Cal.1987) (granting partial summary judgment of liability against 15 liable parties because "the government has incurred costs in response to the release," without inquiry into link between incurred costs and each defendant's activities). (Several other cases cited by the Governments are

omitted here.) The First Circuit reviewed the legislative history of Section 107 and noted that while an earlier bill contained a causation element requiring a plaintiff to "demonstrate a causal or contributory nexus between the acts of the defendant and the conditions which necessitated response action ...," the statute as enacted imposes liability on classes of persons without reference to any causation elements. *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 889 F.2d 1146, 1153 (1st Cir. 1989).

The Governments need only show they have incurred *some* response costs. The question of consistency with the National Contingency Plan is properly reserved for later proceedings where the Court determines how much the Governments have spent and how much they are entitled to recover. "Under Unocal's theory, EPA would be unable to act consistently with the NCP unless it had determined an 'appropriate' response action for each hazardous substance at the site." (Govt's Reply at 19) EPA could not have cleaned up around Unocal's arsenic; soil removal and groundwater cleanup generally sweep with it all hazardous substances without regard to the particular concentrations or substances. The Governments argue by example that:

> Additionally, it is entirely possible for a hazardous waste facility to be comprised entirely of small amounts from many contributors. If each PRP could make Unocal's argument, *i.e.*, that its particular contribution did not warrant remediation and thus that it should not be liable for any costs, *no* party would be liable, despite the fact that the site, as a whole, needed to be cleaned up and the government incurred costs in doing so.

The Governments did incur response costs, and the reliance of Unocal on government studies evidences costs of investigation and sampling, properly recoverable as response costs under CERCLA. *E.g.*, *Wickland Oil Terminals v. Asarco Inc.*, 792 F.2d 887, 892 (9th Cir.1986). Moreover, the Court notes that barrels of Unocal's waste were removed during Phase I.

The Governments argue that apportionment of liability based on the "Gore Factors" is inappropriate because (1) Unocal is jointly and severally liable as the harm at the site is indivisible, and (2) the role of the Gore Factors is in apportioning damages among joint tortfeasors, not in apportioning liability in a governmental cost recovery action. In determining whether the environmental harm is divisible, courts look at the environmental conditions at the site, not, as Unocal suggests, to how much money the governments have spent on various activities. Unocal cites *O'Neil v. Picillo*, 883 F.2d 176 (1st Cir. 1989), but the Governments argue that this is the only case of which they are aware that has discussed the possibility of apportioning CERCLA *liability* in a government enforcement case on the basis of particular costs incurred, rather than on the basis of environmental harm. (There was no holding on this issue, as the appellants did not meet their burden of demonstrating that the costs actually incurred were capable of apportionment.) *Id.* at 181. The Governments have pointed out that the reasoning in *O'Neil* is not controlling in the Ninth Circuit and that the Sixth and Fourth Circuits have specifically looked to site conditions to determine divisibility. *United States v. Monsanto Co.*, 858 F.2d 160, 171 n. 22 (4th Cir.1988) (equitable factors relevant in subsequent actions for contribution, but "not pertinent on questions of joint and several liability, which focuses principally on the divisibility among responsible parties of the harm to the environment."); *United States v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1507 (6th Cir.1989) ("although the basis for each defendant's liability differed, the harm, *i.e.*, the presence of hazardous materials at the Northernaire facility, was the same."). Unocal's argument runs contrary to (1) clearly established rules that governments need not trace response costs to a particular defendant nor demonstrate a minimum quantum of release in order to establish that defendant's liability and (2) the goal of enabling efficient cost recovery actions for governments. Moreover, Unocal does not deal with the question of who should pay for

costs that are not directly traceable to a particular contaminant or defendant, and much of the Governments' costs fall into this category (*e.g.*, while remedial action is being performed by the Phase I and Phase II consenting defendants, the Governments incurred costs for 1983 removal activities, for site investigation, sampling, and analysis, and for enforcement, including negotiations and litigation. Other than the ongoing costs of litigation, the governments are not presently incurring substantial costs in connection with the site. (Govt's reply at 28.)

Only one case supports Unocal's argument on the use of equitable factors *in* apportioning liability, *United States v. A & F Materials Co., Inc.*, 578 F.Supp. 1249 (S.D.Ill.1984), and the Governments submit this is an aberration. Another cited case did not involve the scope of liability between the Government and responsible parties, but among responsible parties. *Allied Corp. v. Acme Solvents Reclaiming, Inc.*, 691 F.Supp. 1100, 1116–17 (N.D.Ill.1988). The *Allied* court stated that while equitable criteria might be appropriate to apportion liability among private parties, it specifically stated that "[i]n employing the moderate approach in the present case, this court makes no ruling as to the propriety of the approach in cost recovery claims involving the government as plaintiff." *Id.* at 1118.

Thus, joint and several liability allows the governments to sue a manageable number of parties and to collect the entire amount of response costs from those defendants. Those defendants may then bring contribution actions for ultimate allocation of damages among the responsible parties where it is entirely appropriate to utilize the Gore Factors to determine the burden each party must bear. The Court in *United States v. Stringfellow*, 661 F.Supp. 1053, 1060 (C.D.Cal.1987), explained:

> There are two distinct contexts in which the issue of "apportionment" arises. It is critical that these two different contexts are not confused. In the first context, the question is whether the harm resulting from two or more causes is indivisible, or whether the harm is capable of division or apportionment among separate causes. If there is a single harm that is theoretically or practically indivisible, each defendant is jointly and severally liable for the entire injury. However, if there are distinct harms that are capable of division, then liability should be apportioned according to the contribution of each defendant.
>
> The second context in which the issue of "apportionment" arises occurs after the first inquiry regarding the indivisibility of the harm. If the defendants are found to be jointly and severally liable, any defendant may seek to limit the amount of damages it would ultimately have to pay by seeking an order of contribution apportioning the damages among the defendants.

Thus, this Court may conclude in the contribution action that Unocal has overpaid based on equitable factors and is entitled to contribution. But the Court's discretion in allocating damages among the defendants during the contribution phase does not affect the defendants' liability.

As to the third-party defense, it fails, as Unocal cannot prove that all releases of arsenic were caused by a third-party. The third-party defense requires proof, among other things, "that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused *solely* by ... an act or omission of a third party...." 42 U.S.C. § 9607(b)(3) (emphasis added). The Fourth Circuit stated that in order to make out this defense, a generator defendant has to "produce specific evidence creating a genuine issue that all of their waste was removed from the site prior to the release of hazardous substances there." *United States v. Monsanto*, 858 F.2d 160, 170–71 & n. 21 (4th Cir. 1988).

Unocal's analysis of the other activities at the site that produced arsenic contamination and its sample by sample analysis do not demonstrate that *all* the arsenic at the site is attributable to others. Unocal's analysis is speculative and uncertain, and even if Unocal is correct that *much* of the arsenic is attributable to other parties, the

third-party defense is unavailable to it because the governments have proved that at least *some* of Unocal's arsenic is at the site. While Unocal asserts that all of its wastes were removed during the 1983 clean-up actions, sampling performed after that clean-up revealed high levels of oxazolidone in the soils (declaration of Ensley at ¶ 18) and during Phase II, a carbon filtration system specifically to remove oxazolidone from the groundwater was installed (declaration of McPhillips).

Finally, Unocal's unclean hands defense is not available as it is inconsistent with CERCLA's language and policies, and equitable defenses cannot apply against the governments acting in their sovereign capacity to assert public rights.

CERCLA Section 107 (42 U.S.C. § 9607(a)) reads: "notwithstanding any other provision or rule of law and subject only to the defenses set forth in subsection (b) of this section." Representative Eckhart, a primary sponsor of the Superfund Amendments of 1986 observed:

> The listed defenses are the only defenses which are available to avoid liability under section 107(a). There should be no other defenses, including equitable defenses, that defeat liability under sections 106 and 107 of the act.

131 Cong.Rec. H11074 (daily ed. Dec. 5, 1985). The Third Circuit held:

> Doctrines such as caveat emptor and "clean hands", which in some cases could bar relief regardless of the degree of culpability of the parties, do not comport with congressional objectives. In the words of one district judge, "the 'unclean hands' doctrine espoused in *Mardan Corp. v. C.G.C.* has no place in CERCLA action."

*Smith Land and Improvement Corp. v. Celotex Corp.*, 851 F.2d 86, 90 (3rd Cir. 1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989). (At least ten other cases reflecting this point of view are cited by the Governments and are omitted here.) Unocal has noted that only a minority of courts have held that Section 107(b) defenses are not exclusive. While the trial court in *Mardan Corp. v. C.G.C. Music,*

*Ltd.,* 600 F.Supp. 1049 (D.Ariz.1984), *aff'd on other grounds,* 804 F.2d 1454 (9th Cir. 1986), held that the equitable defense of unclean hands was applicable in a private response cost recovery action under CERCLA, it specifically stated that "[n]either defendants' contractual defenses nor the unclean hands doctrine would present a bar to recovery" in an action brought by the state or federal government under Section 107(a)(4)(A). *Id.* at 1058. The Ninth Circuit affirmed this decision on other grounds and did not decide the issue of whether the doctrine of unclean hands may be invoked as a defense to a private action brought under Section 107 of CERCLA. In a footnote, the Court noted the government argument that the "unclean hands" defense, as applied by the district court would effectively eviscerate a federal common law right of contribution under CERCLA, noted no appellate court decision on point, and noted most district court decisions have found Section 107 of CERCLA to impose, as a matter of federal law, joint and several liability for indivisible injuries with a correlative right of contribution, citing cases. In summary, the better reasoned decisions and the majority of cases have held that the limited defenses of Section 107(b) are exclusive and that equitable defenses such as unclean hands cannot be asserted because of the clear statutory language and because they would thwart the public interest.

Unocal's allegations do not amount to unclean hands. They make essentially an estoppel argument that has been unavailing in the Courts. Simply because a government may have issued permits to use a certain site for hazardous waste disposal does not prevent it from later bringing an action under CERCLA because such policy would not serve the public interest nor encourage the expeditious cleanup of hazardous waste sites.

The fact that the United States is a former site operator of the Western Processing site does not bar a finding of liability against the defendants nor bar recovery in this action. At a future proceeding in the contribution and counterclaims action (Civ.

No. C89–214M), the United States may be found liable as a former site operator and responsible for some portion of response costs incurred at the site.

Allegations of negligent response activities are not part of unclean hands defense but concern consistency with the National Contingency Plan.

The Governments conclude stating that there are no genuine issues of material fact that preclude summary judgment against Unocal. While there may be some facts in dispute, none are material to the elements of liability or to the available defenses. While Unocal may have raised issues of fairness concerning CERCLA's strict liability scheme, liability of Unocal may not be analyzed on this basis. Any potential inequities resulting from holding Unocal liable, can be mitigated in the contribution action where Unocal's ultimate "fair share" can be determined.

### NIEUWENHUIS, WESTERN PROCESSING, AND RSR'S OPPOSITION

Nieuwenhuis and Western Processing, both pro se, have filed motions for partial summary judgment in response to the Governments' motion for partial summary judgment. Nieuwenhuis and Western Processing seek a finding of liability against the State and Federal Government under Section 107 of CERCLA. Since Nieuwenhuis has not joined issue or otherwise responded to the Fourth Amended Complaint of April 7, 1989, there is no basis upon which the Court can grant his motion. Moreover, this counterclaim should be a matter brought under caption No. C89–214M (the contribution/allocation action). Nieuwenhuis's motion is denied without prejudice.

■ Concerning Western Processing's Motion, the Government asks that the Court strike the memorandum as Garmt Neuiwenhuis is not a licensed attorney and, therefore, cannot represent a corporation. 28 U.S.C. § 1654 provides: "In all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein." Interpreting this provision, the leading case held:

> Corporations and partnerships, by their very nature, are unable to represent themselves and the consistent interpretation of § 1654 is that the only proper representative of a corporation is a licensed attorney, not an unlicensed layman regardless of how close his association with the partnership or corporation.

*Turner v. American Bar Ass'n,* 407 F.Supp. 451, 476 (N.E.Tex.1975), *aff'd mem. sub nom. Taylor v. Montgomery,* 539 F.2d 715 (7th Cir.1976); *also affirmed sub nom. Pilla v. American Bar Ass'n,* 542 F.2d 56 (8th Cir.1976). *Accord, In re Highley,* 459 F.2d 554, 555 (9th Cir.1972) ("A corporation can appear in a court proceeding only through an attorney at law.")

Nieuwenhuis stated in his reply that he discharged Western Processing's attorney, Peter Danello as there were no means to pay for his services. Nieuwenhuis has been unable to find a lawyer to represent him. He also states that he knows nothing about an attorney by the name of Barry J. Briggs, whom the Government believes to represent Nieuwenhuis as his withdrawal has not been approved. The Court notes that Briggs represented Pacific Engineering but was authorized to withdraw about a year ago. Western Processing's motion is stricken from the calendar.

RSR Corporation seeks a finding that the United States and the State of Washington are jointly and severally liable under CERCLA Section 107(a). Similarly, this is a matter concerning counterclaims against the Governments that has been severed and consolidated with the third-party actions under cause No. C89–214M. At oral argument RSR moved to withdraw its motion. RSR's motion is therefore stricken from the Court's calendar.

### CONCLUSION

While Unocal's reasoning seems very appealing, upon reflection and review of the statutes and jurisprudence of CERCLA, the Court concludes that the Governments'

arguments are correct. Congress could have provided for liability to be founded upon different elements, but it chose a liability scheme that is least cumbersome and most expeditious in order that cleanups and replenishment of the Superfund be quickly accomplished. Clean up comes first followed by litigation, if necessary, to determine equitable allocation or contribution among the responsible parties.

The major issue raised by Unocal is whether CERCLA contemplates any quantitative requirement on a "release." This issue is addressed in *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664 (5th Cir.1989), the case that provoked the filing of supplemental memoranda by Unocal and the Governments with the Court's permission. In a private cost recovery action, the Plaintiff Amoco was seeking to recover response costs under CERCLA. Amoco purchased certain property "as is" from Borden. A large pile of physogypsum was on the property. It normally has a low level of radioactivity, but there were "hot spots" within the pile resulting from the dumping of other sludges and scales. There were other radioactive materials constituting "off-pile" wastes. The Court reviewed CERCLA's liability provision requiring a plaintiff to prove: (1) the site is a "facility," (2) the defendant is a responsible person, (3) a release or threatened release of a hazardous substance has occurred, (4) causing plaintiff to incur response costs. The Court noted that plaintiff may recover those response costs that are necessary and consistent with the National Contingency Plan. Once liability is established, the Court will first determine the appropriate remedy and which costs are recoverable, then, under CERCLA's contribution provision, the Court will ascertain each responsible party's equitable share of the clean-up costs.

Amoco and the EPA claimed that the District Court erred in requiring Amoco to show that the property's radioactive emissions violated a quantitative threshold to establish the release of a hazardous substance under Section 9607(a)(4). The Court examined each section of the statute and held as follows:

(1) The statutory language fails to impose any quantitative requirement on the term "hazardous substance," and the Court declined to imply that any is necessary. (A substance is hazardous if it is so listed.)

(2) The statutory language fails to impose any quantitative requirement on the term "release." Borden met the release requirement two ways: 1) disposal of the phosphogypsum on the property, and 2) gas emanating from the radionuclides constitutes a release.

(3) The Court rejected the argument of Amoco and the EPA that liability attaches upon the release of *any* quantity of hazardous material and that the extent of the release should be considered only at the remedial phase. The Court acknowledged that it was entering unexplored territory on this issue, but reasoned as follows: The statutory provision suggesting a threshold for liability is the requirement that a release or threatened release have "cause[d] the incurrence of response costs." § 9607(a)(4). To justify response costs, one necessarily must have acted to contain a release threatening the public health or the environment. In finding a standard essential, the district court noted that "[m]ost of the radionuclides in the atmosphere come from natural sources [and that] radionuclides are used or produced in thousands of locations throughout the United States." *Id.* at 671. The Court reasoned that the rule urged by Amoco and the EPA would permit CERCLA's reach to exceed its statutory purpose by holding parties liable who have not posed any threat to the public or the environment. Use of a "standard of justification" is acceptable. Thus, the question of whether a release caused incurrence of response costs requires a factual inquiry into the circumstances that is focused on whether the hazard justified response actions.

The Fifth Circuit ultimately concluded that the District Court erred in applying a less stringent standard (average measure of radiation from the site) rather than another measure which *Amoco* clearly met. The liability requirement is met if it is

942

shown that "*any* release violates, or any threatened release is likely to violate, *any* applicable state or federal standard, including the most stringent." *Id.* at 672. Thus, Amoco was held to be entitled to summary judgment on the liability issue.

Unocal submits that no arsenic concentrations above background level are attributable to its waste and urges the Court to adopt the Fifth Circuit's reasoning.

The Governments vigorously resist adoption of the Fifth Circuit's interpretation to the facts of this case. First, *Amoco* differs from *Western Processing* as *Amoco* involved *one* generator that released *one* hazardous substance. Second, *Amoco* is a private cost recovery action. Third, the Governments argue that the Court was nevertheless concerned with the environmental harm posed by the site *as a whole.* Fourth, *Amoco* noted that "in cases involving multiple sources of contamination, a plaintiff need not prove a specific causal link between costs incurred and an individual generator's waste." *Id.* at 670–71, n. 8. Fifth, the Fifth Circuit held that the test is not whether the overall levels at the site pose a harm, but whether *any* sample showed amounts that exceeded *any* environmental standard. Releases of arsenic at the Western Processing site exceed federal drinking water standards (Rochlin affidavit at ¶ 14).

■ The Court concludes that *Amoco* should be confined to its facts, it being a single generator, single substance, private cost recovery action. The statute, 42 U.S.C. § 9607(a), is clear in its organization: Subsections (a)(1)–(4) set forth the elements for liability; subsections (A)–(D) describe what the liable parties will be liable for. The language concerning costs consistent with the National Contingency Plan should not be considered an element for demonstrating liability. It is the actions of the potentially responsible parties that determine liability, not the action of the government in pursuing mandated clean-up of hazardous waste sites.

Although the phrase "joint and several liability" does not appear in CERCLA's statutory language, the courts have uni-

formly agreed that Congress intended that the doctrine be applied in appropriate circumstances. The court in *United States v. Chem–Dyne Corp.,* 572 F.Supp. 802 (S.D. Ohio 1983), found that "the legislative history evinces the intent that the scope of liability under CERCLA, 42 U.S.C. § 9607, be determined traditional and evolving principles of common law," 572 F.Supp. at 808, and under these principles, "where two or more persons cause a single and indivisible harm, each is subject to liability for the entire harm." *Id.* at 810. In reauthorizing and amending CERCLA in 1986, Congress endorsed *Chem–Dyne's* exposition of CERCLA's liability scheme. *See, e.g.,* H.R. Rep. No. 253, 99th Cong., 1st Sess., Part 1 at 74 (discussing H.R. 2817, the predecessor House bill to SARA), U.S.Code Cong. & Admin.News 1986, pp. 2835, 2856; 132 Cong.Rec. S17, 138 (daily ed. Oct. 17, 1986) (remarks of Senator Stafford).

■ Western Processing is a multiparty site. Arsenic is present (probably from more than one source) but some is traceable by virtue of the oxazolidone to Unocal. The harm has not been shown to be divisible as the entire site had to be cleaned to remove the hazardous wastes including arsenic. Equitable factors apply in subsequent actions for contribution or allocation of response costs; they are not pertinent on the issue of joint and several liability which focuses on harm to the environment and its indivisibility among joint tortfeasors. The arsenic was in the "chemical soup". Unocal has not demonstrated that its arsenic caused a specific, separate harm. On the contrary, the arsenic contamination was part of other contamination rendering environmental harm to the Western Processing site. Unocal will be able to make its equitable arguments on apportionment in the third-party contribution/allocation action.

NOW, THEREFORE,

(1) There being no material facts in issue on the four statutory liability elements, 42 U.S.C. § 9607;

(2) Unocal having failed to demonstrate that recovery against it is barred by the third-party conduct defense of 42 U.S.C. § 9607(b)(3)—there is no proof that all re-

leases of arsenic were caused solely by a third party;

(3) There being no material issues of fact relative to Unocal's remaining arguments as the Court concludes

(a) that equitable considerations are not available to assist in determining liability under CERCLA; they are appropriate considerations only on the issues of allocation and contribution;

(b) that the issue of whether the Governments have already recovered all legitimate response costs is not properly before the Court on this motion to determine liability; the Governments have shown that they have incurred response costs; and

(c) that the equitable defense of unclean hands is unavailable to Unocal in this CERCLA action where the Governments are acting in their sovereign capacity to assert public rights;

IT IS HEREBY ORDERED the Governments' motion for summary judgment on the issue of liability as to Unocal, RSR, Nieuwenhuis, and Western Processing is GRANTED.

Nieuwenhuis' Motion for partial summary judgment is denied, and Nieuwenhuis' is instructed to answer the fourth amended complaint by April 27, 1990. Western Processing's motion is stricken as it is not properly before the Court under 28 U.S.C. § 1654. RSR's motion is stricken as requested by its counsel.