UNITED STATES of America, Plaintiff,

v.

DICO, INCORPORATED, Defendant.

No. CIV. 4–95–10289.

United States District Court,
S.D. Iowa,
Central Division.

April 1, 1997.

Gary Hayward, Asst. U.S. Atty., Des Moines, IA, Lois Schiffer, Michael N. Romita, U.S. Dept. of Justice, Environmental & Natural Resources Div., Washington, DC, for Plaintiff.

William Koehn, Davis, Hockenberg, Wine, Brown, Koehn & Shors, Des Moines, IA, David Gass, Miller, Johnson, Snell & Cumminskey, Grand Rapids, MI, for Defendant.

## ORDER

LONGSTAFF, District Judge.

The Court has before it plaintiff's motion for summary judgment with respect to liability, and motion for summary judgment with respect to response costs, both filed December 24, 1996. Dico resisted both motions February 3, 1997, and the government has filed reply briefs. A telephonic hearing was held by the Court March 19, 1997. The motions are now considered fully submitted.

## I. BACKGROUND

The following facts either are not in dispute or are viewed in the light most favorable to Dico. This is an action brought by the United States pursuant to section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9607(a).[1] In the mid-1970's, tests conducted by the United States Environmental Protection Agency ("EPA") revealed the drinking water supplied to the City of Des Moines, Iowa was contaminated with the chemical trichloroethane ("TCE"), a chemical solvent used in industrial degreasing operations. The EPA eventually designated a 200 acre parcel of land southwest of downtown Des Moines as the Site of the contamination. Defendant Dico, Inc. is located on the Site. Other businesses and/or landmarks located on the Site include the Tuttle Street landfill, (east of the Dico property), the Des Moines Public School District's Central Campus (originally an aircraft manufacturing plant known as Solar Aircraft), Meredith Publishing Company (which formerly maintained extensive printing production facilities), and a natural drainage area that collects surface drainage from industrial and dry cleaning establishments on Ingersoll Avenue.

The EPA divided the response activities at the Site into a series of operable units. Operable Unit 1 ("OU1") addressed the response activities necessary to prevent ground water contamination from entering the Des Moines Water Works' ("DMWW") underground gallery system. The EPA costs associated with OU1 are the focus of this litigation.

Dico does not dispute it was responsible for at least a portion of the contamination identified in EPA reports, and that it is therefore responsible for at least a portion of the EPA's response costs. Dico resists the EPA's present attempt to hold Dico *solely* liable for all costs, however.

The original Remedial Investigation Report ("RI") prepared for the EPA in December, 1985, identified up to eight potential sources of TCE contamination: Dico; Des

---

1. A more complete recitation of the facts is con- tained in this Court's earlier orders.

Moines School District Central Campus (formerly Solar Aircraft Company); Tuttle Street Landfill; Meredith Corporation; railroad tank car spills in the railyard north of Dico; exfiltration of contaminated sewage from area sewer pipelines; and leachate generated from the Des Moines water treatment plant sludge disposal pits. *See* Final Remedial Investigation Report of Des Moines TCE Site, submitted December 17, 1985, Tab 16 of Defendant's Exhibits in Resistance to Present Motion. Although no other party was named by the government as a defendant in the present matter, Dico nevertheless believes liability should be apportioned.

Alternatively, Dico notes that the EPA has recognized the existence of two "plumes" of contamination, the second of which is "located north and up-gradient from Dico's property." *Dico, Inc. v. Diamond*, 35 F.3d 348, 349 (8th Cir.1994). Dico argues that even if the response costs attributed to the first, or south plume, cannot easily be divided, Dico nevertheless should be relieved of liability for response costs generated from the north plume.

In its present motion for summary judgment, the government claims it need not prove Dico was the only responsible party in order to establish liability for its response costs under § 9607. Furthermore, it disputes Dico's theory that pollution attributed to the "north plume" can be apportioned with any degree of certainty.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Walsh v. United States*, 31 F.3d 696, 698 (8th Cir. 1994). The moving party must establish its right to judgment with such clarity there is no room for controversy. *Jewson v. Mayo Clinic*, 691 F.2d 405, 408 (8th Cir.1982).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue is "genuine," if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. at 2510. "As to materiality, the substantive law will identify which facts are material. . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

## III. LIABILITY

■ To establish CERCLA liability against a particular defendant under § 9607(a), a plaintiff must establish the following elements: (1) the defendant is within one of the four classes of covered persons set forth in 42 U.S.C. § 9607(a); (2) a release or threatened release from a facility occurred; (3) the plaintiff incurred response costs as a result; and (4) those response costs were necessary and consistent with the national contingency plan. *Control Data Corp. v. S.C.S.C. Corp.*, 53 F.3d 930, 934 (8th Cir. 1995) (citing *United States v. Aceto Agricultural Chemicals Corp.*, 872 F.2d 1373, 1378–79)).[2]

■ If the liability requirements are met, the defendant is strictly liable under CERCLA unless the defendant can prove one of the three limited defenses set forth in 42 U.S.C. § 9607(b), namely, that the release and the resulting damages were caused *solely* by: (1) an act of God; (2) an act of war; (3) an act or omission of a third party other than an employee or agent of the defendant, or other than one whose act or omission occurred in connection with a contractual relationship. 42 U.S.C. § 9607(b). *See also General Electric Co. v. Litton Industrial Automation Systems, Inc.*, 920 F.2d 1415, 1417 (8th Cir.

**2.** The test was articulated slightly differently in *Aceto* as follows:

(1) the Site in question is a facility;
(2) a "release" or "threatened release" of a "hazardous substance" from the Site has occurred;

(3) the release or threatened release caused the United States to incur response costs; and
(4) the defendant falls within at least one of the four classes of responsible persons described in section 9607(a).
*Aceto Agricultural Chemicals Corp.*, 872 F.2d 1373, 1378–79.

1990), *cert. denied*, 499 U.S. 937, 111 S.Ct. 1390, 113 L.Ed.2d 446 (1991).

### A. Whether Dico is Liable Generally Under § 9607(a)

In the present case, Dico does not dispute it is within one of the four classes of covered persons under 42 U.S.C. § 9607(a), or that a release or threatened release occurred in some amount from its facility.[3]

■ With respect to the third element under § 9607(a), whether the plaintiff incurred response costs, the Eighth Circuit has held that "even when there is an actual release, a plaintiff must establish a *causal nexus* between that release and the incurrence of response costs." *Control Data Corp. v. S.C.S.C. Corp.*, 53 F.3d at 935 n. 8 *(citing General Electric Co. v. Litton Industrial Automation Systems, Inc.*, 920 F.2d 1415, 1417 (8th Cir.1990)) (emphasis added). Due to a previous factual dispute regarding causation of the response costs incurred by the United States, this Court denied summary judgment in February, 1996. *See* February 2, 1996, order, at 13. This issue has now been resolved for purposes of § 9607(a). Liability under § 9607(a) requires only that the plaintiff establish· it incurred some costs as a result of the release or threatened release. *See e.g. United States v. Western Processing Co.*, 734 F.Supp. 930, 937 (W.D.Wash.1990); *see also Kelley v. Thomas Solvent Co.*, 727 F.Supp. 1532, 1551 (W.D.Mich.1989) (amount of recoverable response costs need not be determined prior to establishing actual liability under § 9607). Dico does not dispute the United States incurred *some* response costs as a result of the TCE contamination at issue. Therefore, the Court finds no material issues of fact with respect to the third element.

The fourth element under § 9607(b), whether response costs are consistent with the national contingency plan, is discussed with regard to the government's motion for summary judgment on response costs in part IV, below.

### B. Whether Dico Can Nevertheless Establish Divisibility of Costs

■ "With near unanimity, courts have found that section [9607] liability is joint and several unless the defendant can demonstrate that the harm is divisible." *Pinal Creek Group v. Newmont Mining Corp.*, 926 F.Supp. 1400, 1404 (D.Ariz.1996). Where appropriate, courts have looked to general tort principles, and in particular, to § 433A of the Restatement (Second) of Torts (1977), to apportion liability among multiple defendants. *See e.g. United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 722 (2d Cir.1993); *United States v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1507 (6th Cir.1989); *United States v. Monsanto Co.*, 858 F.2d 160, 169 (4th Cir.1988); *Memphis Zane May Assoc. v. IBC Manufacturing Co.*, 952 F.Supp. 541 547–48 (W.D.Tenn.1996); *United States v. Broderick Investment Co.*, 862 F.Supp. 272, 276 (D.Colo.1994)[4] It is the defendant's burden, however, to establish a "reasonable basis" by which to apportion liability, or to establish that distinct harms exist. *In re Bell Petroleum Services, Inc.*, 3 F.3d 889, 902–03 (5th Cir.1993); *United States v. Alcan Aluminum Corp.*, 990 F.2d at 722. For example, a defendant can produce evidence showing "relative toxicity, migratory potential, degree of migration or 'synergistic capacities' of the hazardous substances at issue." *Memphis Zane May Assoc. v. IBC Manufacturing Co.*, 952 F.Supp. at 547–48 *(quoting United States v. Alcan Aluminum Corp.*, 990 F.2d at 722).

---

3. Dico does dispute the *amount* of release from its facility. This argument is irrelevant, however, to whether liability can be established against Dico under § 9607(a). All that is required under § 9607(a) is that a release or threatened release occurred from Dico's facility. 42 U.S.C. § 9607(a). As noted by the court in *United States v. Western Processing Co., Inc.*, 734 F.Supp. 930, 936 (W.D.Wash.1990), "[n]either does the statutory definition of 'release' contain a threshold requirement. A 'release' is 'any spilling, leaking, etc.' " *(citing* 42 U.S.C. § 9601(22)).

4. The Court notes that Dico also may bring a separate action for contribution under 42 U.S.C. § 9613(f). Although a strict liability standard is imposed under § 9607, Dico would face a lesser burden of proof with regard to allocation of responsibility under § 9613(f). "In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f). *See also Control Data Corp. v. S.C.S.C. Corp.*, 53 F.3d at 935.

In the present case, Dico looks to these common law tort principles to establish material issues of fact as to whether the liability for all response costs can be allocated among other parties. As reasoned by the Fifth Circuit Court of Appeals in *Bell Petroleum*:

Essentially, the question whether there is a reasonable basis for apportionment depends on whether there is sufficient evidence from which the court can determine the amount of harm caused by each defendant. If the expert testimony and other evidence establishes a factual basis for making a reasonable estimate that will fairly apportion liability, joint and several liability should not be imposed in the absence of exceptional circumstances. The fact that apportionment may be difficult, because each defendant's exact contribution to the harm cannot be proved to an absolute certainty, or the fact that it will require weighing the evidence and making credibility determinations, are inadequate grounds upon which to impose joint and several liability.

*In re Bell Petroleum Services, Inc.*, 3 F.3d at 905.

*Bell Petroleum* was a CERCLA § 9607 action filed against three successive operators of a chrome-plating shop found to have released chromium into the City of Odessa, Texas' water supply. *Id.* at 892–93. The district court found the three defendants jointly and severally liable for the government's response costs. In a subsequent proceeding on apportionment the district court then concluded that "there was no method of dividing the liability among the defendants which would rise to any level above mere speculation," but that alternatively, based on equitable factors, each defendant should be responsible for approximately one-third of the costs. *Id.* at 894.

Despite its alternative finding, however, the district court refused to reconsider its determination that all defendants were jointly and severally liable. It then approved favorable settlement agreements reached by two of the three defendants with the EPA. The third defendant was therefore left responsible for the bulk of the EPA's response costs, and appealed the district court's decision to the Fifth Circuit Court of Appeals. *Id.*

On appeal, the Fifth Circuit reversed the district court's grant of summary judgment on the issue of apportionment, finding the circumstances at issue to be:

closely analogous to the *Restatement's* illustrations in which apportionment of liability is appropriate. For example, where cattle owned by two or more defendants destroy the plaintiff's crops, the damages are apportioned according to the number of cattle owned by each defendant, based on the reasonable assumption that the respective harm done is proportionate to that number.... Likewise, pollution of a stream by two or more factories may be treated as divisible in terms of degree, and apportioned among the defendants on the basis of evidence of the respective quantities of pollution discharged by each.

*Id.* at 903.

The court then concluded that because it had evidence regarding the volume of contaminants released by each defendant, there was "sufficient evidence from which a reasonable and rational approximation of each defendant's individual contribution to the contamination [could] be made." *Id.*

■ In the present case, however, the record is devoid of evidence regarding the respective quantities of pollution discharged by other parties. Furthermore, none of Dico's experts has been able to provide a "reasonable apportionment" of the contamination caused by Dico as compared with other potential sources. When asked during his deposition whether he had an opinion with regard to the percentages of TCE released by sources such as Solar Aircraft or Meredith, Dico's expert Gazi George responded:

A. No, I do not. It's impossible, because there were no real efforts to establish the TCE concentrations or the DCE or the vinyl chloride concentrations at the other two locations.

Q. In your view, it would be impossible to figure out how much of it came from those other locations?

A. After twenty years, I think it is, because of the nature of the materials.

Deposition of Gazi George, at 81–82.

Dico's other principal expert, Abdul Abdul, Ph.D., is similarly unable to quantify the

percentages of contamination caused by other parties. Deposition of Abdul Abdul, at 26, Tab 9 of Defendant's Exhibits Submitted in Resistance to Present Motion. Furthermore, as discussed below, the methodology Dr. Abdul used to develop his opinion could not support a "reasonable apportionment."

Secondly, unlike *Alcan, Bell Petroleum, Monsanto*, and others, this is *not* a multi-defendant action. If this Court were to deny summary judgment based on a potential division of liability, it would expect to make an appropriate division at trial. Yet the record not only lacks evidence by which to quantify other parties' liability, but also lacks evidence to confirm that releases did in fact occur from other facilities. According to the government, this apparent lack of evidence against third parties, as well as its belief that Dico is responsible for the majority of the contamination, caused the government to name only Dico as a defendant in the current action.

The Court finds Dico has failed to meet its burden to establish a reasonable basis for apportioning liability to third parties. *United States v. Alcan Aluminum Corp.*, 990 F.2d at 722.

### C. Whether Costs Should be Separated with Regard to "North Plume"

In addition to seeking general apportionment of liability, Dico also contests its liability for *all* costs related to the "north plume." Specifically, Dico claims that, with respect to TCE contamination identified in the north plume, it is entitled to the third-party defense under § 9607(b).

As noted by Dico, EPA Project Manager Alice Fuerst testified in deposition that the two northern wells in the extraction system pulled TCE from the north and not from Dico's property. Deposition of Alice Fuerst at 116, Tab 22 to Dico's Exhibits Submitted in Resistance to Present Motion. This is not a situation in which contamination identified in non-contiguous properties were grouped together in one CERCLA action, however. *See e.g. Akzo Coatings, Inc. v. Aigner Corp.*, 881 F.Supp. 1202, 1211 (N.D.Ind.1994) (summary judgment granted in favor of defendants based on fact contaminated sites were non-contiguous); *United States v. Fairchild*

*Industries, Inc.*, 766 F.Supp. 405, 416 (D.Md. 1991) (lumping non-contiguous properties in CERCLA action "would go beyond the bounds even of the liberal nexus between the defendants and the response which was set forth in *Monsanto* "). Rather, in the present action, even assuming two separate "plumes" existed at one time, the contamination has since commingled by virtue of the groundwater extraction system. As explained by William Soukoup, Dico's project manager for the OU1 groundwater remediation system:

> [T]he contamination that's beneath the Dico facility now is, in my view, a composite of probably two relatively separate sources; in other words, the north plume, which has its sources somewhere north of the Dico facility, has commingled with what I call the south plume, which likely has its source or sources very proximal to the Dico production building. These two plumes have commingled and is (sic) now being extracted by the groundwater extraction system.

Deposition of William Soukoup, at 71, Exhibit A to Government's Reply Brief.

Dico attempts to create a material issue of fact through Dr. Abdul's statement that only a small fraction—or about 20 %—of the TCE in the north gallery of the DMWW comes from the groundwater beneath the Dico production facility. This Court disagrees that his theory precludes summary judgment.

Dr. Abdul admits that this calculation focuses specifically on the percentage of groundwater he believes flows directly under the Dico manufacturing building. Deposition of Abdul Abdul, at 14, Exhibit C to Plaintiff's Reply Brief. It therefore fails to include contamination attributed to sludge spread on the roadways by Dico or any other contamination originating on the Dico property as a whole.

Furthermore, although Dr. Abdul contends that much of the contamination found in groundwater near the Dico production building was collected and redistributed there from other sources via the "Ingersoll Run"— he himself admits it would be "impossible" to quantify the percentage attributed to Non-Dico sources. *Id.* at 35. The Eighth Circuit has held:

When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict.

*Morgenstern v. Wilson,* 29 F.3d 1291, 1297 (8th Cir.1994) (*quoting Brooke Group v. Brown & Williamson Tobacco Co.,* 509 U.S. 209, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993)). The Court finds Dr. Abdul's testimony and opinions lack sufficient basis in fact to create a material issue of fact.

Finally, Dico's alternative claim that it should be held liable for only 5/7 of the government's response costs based on the fact two of the extraction wells are located north of its property is also unpersuasive. As noted by the court in *Western Processing,* "[i]n determining whether the environmental harm is divisible, courts look at the environmental conditions at the site, not as [defendant] suggests, to how much money the government has spent on various activities." *United States v. Western Processing Co.,* 734 F.Supp. at 937.

The Court therefore finds Dico is unable to create a genuine issue of material fact regarding whether it is liable for response costs attributable to the "north plume."

## IV. RESPONSE COSTS

### A. Additional Relevant Facts

As discussed above, the EPA has divided response activities for the contaminated site at issue into four phases, referring to each phase as a separate "operable unit" or "OU." The investigation begun by EPA in 1984 is referred to as OU1, because it addressed contaminated groundwater entering the public water supply.

The government claims that, as of March 31, 1996, it has incurred $4,378,110.66 in response costs attributed to OU1. These costs arose primarily from the collection and analysis by private laboratories of samples from the area; oversight activities conducted by EPA employees; the evaluation of potential remediation alternatives to address the groundwater contamination; and employee payroll and travel expenses incurred by the Department of Justice (attorney's fees and costs). As of September 30, 1996, expenditures made by the Department of Justice total $111,747.47.

Dico has not challenged the fact the United States incurred the stated $4,378,110.66 in response to contamination identified at the Site at issue.

### B. Applicable Law and Discussion

■ Pursuant to CERLCA § 107(a)(4)(A), 42 U.S.C. § 9607(a)(4)(A), the government may recover from responsible parties "all costs of removal or remedial action ... not inconsistent with the national contingency plan." Once the government has established its prima facie case that costs have been incurred, the burden shifts to the responsible party—in this case, Dico—"to prove the response costs were inconsistent with the [national contingency plan], not cost-effective or unnecessary." *United States v. Northeastern Pharmaceutical & Chemical Co., Inc.* (*"NEPACCO"*), 810 F.2d 726, 747 (8th Cir. 1986).

■ Dico first contends that, as a matter of law, oversight costs and indirect costs are not recoverable under § 9607. In making this argument, Dico relies on the Third Circuit Court of Appeals' decision in *United States v. Rohm & Haas Co.,* 2 F.3d 1265, 1275 (3d Cir.1993), which held that "[section] 107(a) does not allow government recovery of the costs incurred in conducting such oversight activity." As reasoned by the court:

Given the extent of [the] expected private activity and the established prior practice of financing oversight activities from appropriated funds, a directive that EPA would henceforth be able to recover all of the costs of overseeing private corrective actions under any applicable environmental statute would represent a major policy change. We find it difficult to believe that Congress would choose to manifest such a change solely by including in CERCLA's definition of removal a reference to "such actions as may be necessary to monitor, assess, and evaluate the release o[r] threat of release of hazardous substances."

We think it far more likely that Congress viewed EPA's overseeing of a private party's removal activities as qualitatively

different from EPA's actually performing removal activities and intended for EPA to recover the costs of the latter but not the costs of the former. Had its view and intent been otherwise, we are confident that it would at least have made some reference to government activity under [section] 106 when it was carefully providing examples of removal actions at the conclusion of the definition.

*Id.* at 1276–77.

As noted by the government, however, *Rohm & Haas* is somewhat of an aberrant decision. Courts reviewing the issue prior to *Rohm & Haas* consistently allowed indirect and oversight costs. *See e.g. United States v. NEPACCO,* 810 F.2d 726, 748 (8th Cir. 1986); *United States v. R.W. Meyer,* 889 F.2d 1497, 1504 (6th Cir.1989); *United States v. Hardage,* 733 F.Supp. 1424, 1438–39 (W.D.Okla.1989), *aff'd in part, reversed on other grounds,* 982 F.2d 1436 (10th Cir.1992). Since *Rohm & Haas,* the majority of courts outside of the Third Circuit have declined to follow the decision. *See e.g. Atlantic Richfield Co. v. American Airlines, Inc.,* 98 F.3d 564 (10th Cir.1996); *United States v. Ekotek,* 1995 WL 580079, at *4–5 (D.Utah Sept.11, 1995); *United States v. Lowe,* 864 F.Supp. 628, 631–32 (S.D.Tex.1994); *but see Central Maine Power Co. v. F.J. O'Connor Co.,* 838 F.Supp. 641 (D.Me.1993) (accepts *Rohm & Haas* without comment).

As explained by the court in *Atlantic Richfield,* "*Rohm & Haas* departed significantly from prior case law that had construed the cost recovery provisions of CERCLA broadly." *Atlantic Richfield Co. v. American Airlines, Inc.,* 98 F.3d at 568. Furthermore, *Rohm & Haas* was a removal action—not a *remedial* action as in *Atlantic Richfield* and the present case. *See id.* at 568. ("The court in *Rohm & Haas* analyzed only the definition of removal [under § 9601(23) ], and did not consider or cite the broader definition of remedial action [under § 9601(24) ].")[5]

Regardless of whether the statutory definition of "removal" includes government oversight of private party removal actions, "[g]overnment monitoring or oversight reasonably required to assure that private party *remedial* actions protect the public health and welfare and the environment is remedial action as defined in Section 101(24) of CERCLA," and therefore, recoverable as a response cost. *Id.* at 570 (emphasis added).

This Court finds *Atlantic Richfield* particularly persuasive in the context of the present remedial action, and concludes the government may recover both indirect and oversight costs.

Dico also cites to the United States Supreme Court's decision in *Key Tronic Corp. v. United States,* 511 U.S. 809, 818–20, 114 S.Ct. 1960, 1967, 128 L.Ed.2d 797 (1994) for the premise that it should not be responsible for the government's attorneys' fees. As recently noted by the Second Circuit Court of Appeals, however, "*Key Tronic* denied *private parties* the right to recover[ ] attorneys' fees in a suit for contribution brought against the United States. The Court specifically 'offer[ed] no comment on the extent to which th[e] phrase ["enforcement activities"] forms the basis for the Government's recovery of attorneys' fees through § [9607]'" *B.F. Goodrich v. Betkoski,* 99 F.3d 505, 528 n. 6 (2d Cir.1996) (emphasis added) (*quoting Key Tronic Corp. v. United States,* 511 U.S. at 818–20, 114 S.Ct. at 1967).

■ Section 9601(25) expressly includes "enforcement activities" among recoverable response costs. At least one court within this circuit has held that the United States may recover "all litigation costs, including attorney fees." *United States v. Northeastern Pharmaceutical & Chemical Co., Inc.* ("*NEPACCO*"), 579 F.Supp. 823 (W.D.Mo. 1984). This decision was subsequently affirmed by the Eighth Circuit. *United States v. NEPACCO,* 810 F.2d 726 (8th Cir.1986).

---

5. "Remedial action" is defined under § 9601(24) to include:

> such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging

> or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, *and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment.*

42 U.S.C. § 9601(24) (emphasis added).

Accordingly, the Court finds the government is entitled to recover all attorneys' fees expended in regard to OU1.

Dico also argues material issues of fact exist with respect to whether the EPA's actions were arbitrary and capricious in assigning responsibility for oversight and response costs only to Dico, despite evidence of other parties. As noted by the government, however, this argument merely repeats similar arguments made in resistance to the government's motion for summary judgment on liability.

Finally, Dico claims that the EPA's methods for calculating and allocating its costs are arbitrary and capricious, noting that, in calculating and assigning oversight costs to OU1, the EPA's Glenn Curtis relied on his "personal familiarity with activities at the Site, and his review of Site records." *See* Memorandum of the United States in Support of United States' Motion for Summary Judgment on Response Costs, pp. 10, 12).

Under the statute itself, however, the government's stated costs are "conclusively presumed" to be consistent with the national contingency plan unless proven otherwise by Dico. 42 U.S.C. § 9607(a)(4)(A). *See also United States v. NEPACCO*, 810 F.2d 726, 747 (8th Cir.1986). Dico has failed to provide evidence that Mr. Curtis' figures are in any way inaccurate, or inconsistent with the national contingency plan, and thus, has failed to meet its burden under § 9607(a)(4)(A).

## V. CONCLUSION

For the reasons outlined above, plaintiff's motion for summary judgment on liability is GRANTED. Plaintiff's motion for summary judgment on response costs is GRANTED. The Clerk of Court is directed to enter judgment in favor of plaintiff and against defendant in the amount of $4,378,110.66.

IT IS SO ORDERED.