**A & W SMELTER AND REFINERS, Inc, a California corporation, Plaintiff–Appellant,**

v.

**William J. CLINTON, in his official capacity as President of the United States; Carol M. Browner, in her official capacity as Administrator of the U.S. Environmental Protection Agency; Environmental Protection Agency, Defendants–Appellees.**

No. 97–15596.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 10, 1998.

Decided June 24, 1998.

---

Matthew J. Nasuti, McQuaid, Metzler, McCormick & Van Zandt, San Francisco, California, for the plaintiff-appellant.

John T. Stahr, Department of Justice, Environment and Natural Resources Division, Washington, DC, for the defendants-appellees.

Before: GOODWIN, KOZINSKI and THOMPSON, Circuit Judges.

KOZINSKI, Circuit Judge.

The Environmental Protection Agency ordered plaintiff to dispose of ore containing gold and silver because it also contained small quantities of lead. We must resolve various questions of statutory etymology on the way to deciding who must pay for this disposal.[1]

### The Ore in Motion and at Rest

"Ore Pile # 2" (O2P) at A & W Smelter's processing facility in the Mojave Desert contained ore that had been piling up since the Sixties. The ore included small amounts of silver and gold, not quite enough to justify smelting by A & W's methods. Unhappily for A & W, the ore also contained some naturally-occurring lead, with some slag mixed in as well. Slag is a waste product of smelting.

Under pressure from state and federal authorities, A & W decided to move O2P. To that end, it contracted with Roelof Mining Company to process the ore in Baja, Mexico. A & W packed the ore into drums and started shipping it, but several trucks were stopped at the border and their contents labeled hazardous because of the lead. Several months later, Mexico returned these trucks to the United States. The EPA ordered A & W to take this ore back within three days, but A & W was unable to arrange a pickup on short notice. EPA then declared the ore abandoned, brought it to a storage facility and issued Order 93–06 directing A & W to dispose of the ore in an approved landfill.

After seeing some of its trucks impounded, A & W diverted other trucks. Six truckloads wound up in Nevada. A & W claims this was a temporary resting place as the ore waited to be processed at the nearby Durga Mine facility. The EPA found this ore as well and issued Order 93–03 directing A & W to ship it to a hazardous waste landfill.[2]

A & W complied with both disposal orders and then filed a complaint seeking reimbursement of its compliance costs. *See* 42 U.S.C. § 9606(b)(2). The EPA and its co-defendants moved for summary judgment, which the district court granted. *See A & W Smelter & Refiners, Inc. v. Clinton,* 962 F.Supp. 1232 (N.D.Cal.1997).[3]

### The Statutory Framework

The Comprehensive Environmental Response, Compensation, and Liability Act regulates cleanup and disposal of hazardous substances. CERCLA gives the EPA several mechanisms for enforcing the Act against violators. Under one of these, 42 U.S.C. § 9606(a), "when the President determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility," he may issue orders, as the EPA did here in his name. Those who violate such orders face fines of up to $25,000 a day. *See* 42 U.S.C. § 9606(b)(1).

Those who pay for the cleanup, but believe they should not have, may petition for reim-

1. A & W does not seek reimbursement for the value of the ore, as indeed it could not. Any such claim would have to be brought in the Court of Federal Claims under the Tucker Act. *See* 28 U.S.C. §§ 1346(a)(2), 1491.

2. A & W claims the EPA orders do not establish the proper delegation of authority. Both orders start by explaining the chain of delegation. Executive Order No. 12,580, 52 Fed.Reg. 2923 (1987), delegates authority from the President to the Administrator of the EPA. Delegation No. 14–14–B further delegates authority from the Administrator to Regional Administrators. This delegation says the Regional Administrators must consult with the Assistant Administrator for Solid Waste and Emergency Response, but a clarification dated April 4, 1990, provides that the "consultation occurs during the decision-making pro-

cess and is therefore implicit in the delegation process...." Regional delegation 1290.41 in turn delegates authority from the Regional Administrator to the Director, Toxics and Waste Management Division. The orders here were issued by the Director, Hazardous Waste Management Division. A & W makes much of the difference in title. The EPA replies that the division's title has changed, but does not point to any evidence that this is the same division with a new name. On remand the district court shall verify whether the EPA's assertion is correct.

3. A & W claims the district court improperly made credibility findings in granting summary judgment, but it is mistaken. It also claims that the court improperly considered inadmissible evidence, but we see no abuse of discretion.

bursement of reasonable costs incurred. *See* 42 U.S.C. § 9606(b)(2)(A). If the EPA refuses, they may sue in district court, *see* 42 U.S.C. § 9606(b)(2)(B), as A & W did here. A & W is entitled to reimbursement if it was not liable for response costs under section 9607(a). *See* 42 U.S.C. § 9606(b)(2)(C). Even if otherwise liable, it may be reimbursed if the order was arbitrary and capricious. *See* 42 U.S.C. § 9606(b)(2)(D). A & W claims reimbursement on both of these grounds.

The EPA claims A & W is responsible for the cleanup costs pursuant to sections 9607(a)(3) & (4), which hold liable "any person who by contract, agreement, or otherwise arranged for disposal or treatment ... of hazardous substances owned or possessed by such person ... from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance...." We must ponder the meaning of several of these statutory words and phrases: "hazardous substance," "release," "disposal," "treatment," "waste" and "imminent and substantial endangerment."[4]

### "Hazardous substance"

EPA labeled O2P a hazardous substance because it contained lead. All agree that at some level of concentration lead is hazardous. But is it hazardous at this level? CERCLA defines hazardous substance as "any substance designated pursuant to" several other statutes, or to EPA regulations promulgated under CERCLA. *See* 42 U.S.C. § 9601(14). The EPA points to regulations promulgated under CERCLA at 40 C.F.R. § 302.4, where lead is listed, along with various lead compounds.[5] The EPA also points to Clean Water Act regulations listing lead. *See* 33 U.S.C. § 1321(b)(4); 40 C.F.R. § 401.15.

A & W asks us to read a minimum level requirement into the statute and regulations. It argues that trace levels of hazardous substances are present just about everywhere. Read as the EPA suggests, CERCLA seems to give the agency carte blanche to hold liable anyone who disposes of just about any-

thing. Drop an old nickel that actually contains nickel? A CERCLA violation. Throw out an old lemon? It's full of citric acid, another hazardous substance.

■ It's not surprising that an agency would urge an interpretation which gives it such broad discretion. Perhaps more surprising is that CERCLA leaves us little choice but to agree. Section 9601(14) refers simply to "any substance" designated under one of the various regulations, and the regulations in turn give no minimum levels. The table in 40 C.F.R. § 302.4 does list reportable quantities, but this refers to notification requirements under 42 U.S.C. §§ 9602 & 9603. Under these sections, anyone who owns a facility which stores hazardous substances and releases a quantity of a substance above the reportable level must notify the EPA. Nothing in the law suggests that quantities of a hazardous substance below its reportable level render it no longer hazardous. The Second, Third and Fifth Circuits have faced this very question and all agree that CERCLA's definition of hazardous substance has no minimum level requirement. *See United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 720 (2d Cir.1993) (*Alcan II*); *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 260–63 (3d Cir.1992) (*Alcan I*); *B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1199–1201 (2d Cir.1992); *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 669 (5th Cir. 1989). We see no basis for parting company.

The Fifth Circuit has imposed a minimum level requirement through the back door. It did so by focusing on language in section 9607(a)(4) which defines a liable person as one responsible for a release "which *causes* the incurrence of response costs." 42 U.S.C. § 9607(a)(4) (emphasis added); *see Amoco*, 889 F.2d at 669. The Fifth Circuit held that the release causes the EPA's response only if it poses a serious enough threat to justify the response; otherwise, the response is caused by the agency's overzealousness. *See id.* at 671. In our view, this reads much too much into the word "causes" in section 9607(a)(4).

---

**4.** A & W cites *Lara v. Secretary of the Interior*, 820 F.2d 1535 (9th Cir.1987), for the proposition that precious metal mining is subject to different rules. *Lara* concerns mining discovery claims. It has nothing to do with CERCLA or this case.

**5.** A & W also argues that mineral lead is not a hazardous substance under any of the relevant regulations. Mineral lead is still lead.

Where a party is responsible for a particular release,[6] that party is a cause of any response to that release, although on occasion EPA overzealousness may be another cause as well. The Fifth Circuit rather explicitly adopted this strained definition of the causation requirement as a way of getting around the lack of a minimum level requirement. *See id.* at 670. We sympathize, but we believe it is not our function to read into the statute a limitation that Congress did not put there.[7] Other circuits agree. *See Alcan II,* 990 F.2d at 721 (collecting cases).

## "Release"

To issue an order under section 9606(a), there must be "an actual or threatened release of a hazardous substance." Release is defined as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant). . . ." (whew) 42 U.S.C. § 9601(22). For the shipment left near Durga Mine there was unquestionably a release: Wind was blowing particles from the pile; A & W does not dispute this.

There is a serious question, though, as to the shipment the government sent to the Appropriate Technologies facility. As to this shipment, there was no release into the environment (in the ordinary sense): The lead-bearing ore stayed safely within the shipping drums. The government, however, claims that A & W abandoned the ore, which is one form of release under the statute. The

EPA's abandonment theory rests on A & W's failure to move the shipment within the time allowed by the EPA. A & W claims that it intended to retrieve the material, but as a small company it couldn't respond within the three days the EPA allowed. The question is whether the agency can deem the shipment abandoned (and therefore released) for purposes of CERCLA because A & W failed to move it within the time allotted by the EPA.

We are unaware of caselaw defining abandonment under section 9601(22).[8] Nor is this a term of art specific to CERCLA. Rather, it's a term with a rich common law tradition. Property is abandoned when the owner intends to divest himself of all interest in it. *See* 1 Am.Jur.2d, Abandoned, Lost, and Unclaimed Property §§ 11, 13 (1994). A & W argues that it did not intend to abandon this property, that it intended to retrieve it but just didn't have the means to do so within the time allotted by the EPA. The EPA order does not seem to have considered A & W's intent; rather, the EPA deemed the property abandoned just because the agency said it was abandoned. Had the EPA published regulations defining abandonment quite differently from the common law, those regulations would be due considerable deference. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Published regulations would also have given A & W notice as to what constitutes abandonment. Even a well-established agency practice of defining abandonment so as to cover situations like this would be due defer-

---

**6.** Causation becomes trickier where multiple parties have contributed to the pollution at one site. *See Alcan II,* 990 F.2d at 722 (collecting cases).

**7.** In a situation where it is truly unreasonable for the EPA to respond to a release, the party held liable could claim that the EPA's action was arbitrary and capricious. *See* 42 U.S.C. § 9606(b)(2)(D). Although A & W has claimed that the EPA's action was arbitrary and capricious, its claim is based on totally different grounds. *See infra* at 6521.

**8.** A & W points to customs regulations defining abandonment, giving time ranges from thirty days to five years. *See* 19 C.F.R. § 127.12. Depending on the facts, these regulations may well

be relevant. If the trucks carrying the ore were in the Custom Service's custody, A & W might be justified in relying on these regulations to define intent to abandon, although as the text explains that might not be so in an emergency. *See infra* at 6519. The record is somewhat unclear as to the Custom Service's involvement. Three trucks were impounded by Mexican customs while four trucks detained by U.S. Customs were held at the L & Z Trucking yard in Chula Vista. The trucks from Mexico were returned to the U.S., and the U.S. Government sent them to the Appropriate Technologies storage facility. The EPA seems to have coordinated the movement of the trucks, but it is not clear whether the Customs Service also played a role, and if so what that role was.

ence. However, the EPA presented no evidence of such a practice.

 Ad hoc agency action such as here is also entitled to some deference, but not all deference is created equal. How much deference an agency decision is due depends in part on such factors as how much deliberation went into reaching it and whether the decision fits with a policy the agency has consistently followed. *See Atchison, Topeka & Santa Fe Ry. v. Pena,* 44 F.3d 437, 442 (7th Cir.1994), *aff'd sub nom. Brotherhood of Locomotive Eng'rs v. Atchison, Topeka & Santa Fe R.R.,* 516 U.S. 152, 116 S.Ct. 595, 133 L.Ed.2d 535 (1996); *Barnett v. Weinberger,* 818 F.2d 953 (D.C.Cir.1987). Here, one EPA administrator, faced with an allegedly imminent threat, wrote an administrative order ignoring entirely A & W's intent to abandon. A & W had no opportunity to respond before the order was issued. In a single sentence that order simply stated that the ore was abandoned and that this was a release under CERCLA. *See* Administrative Order 93–06 at 7–8. There's no sign the agency considered the possible objections to this position, and no recognition of the fact that so defined the term becomes something very different from what Congress likely had in mind when it used it. We see no reason to defer to an implausible interpretation of the statute under these circumstances.[9]

The matter might well be different in an emergency. When hazardous waste presents a serious, immediate threat and the waste's owner is not present to take control, it may be reasonable for the EPA to declare the waste abandoned and take appropriate steps to dispose of it safely. This, however, would require a substantial showing on the EPA's part that the trucks had to be moved quickly to avoid danger to health or the environment. The EPA is free to make such a showing on remand.

### "Disposal," "Treatment" and "Waste"

A & W is a liable party under section 9607(a)(3) only if it arranged for "disposal or treatment" of hazardous substances. Disposal, as defined in the Solid Waste Disposal Act, *see* 42 U.S.C § 9601(29), is "the discharge [and so on] of any solid *waste* or hazardous *waste* . . . ." 42 U.S.C. § 6903(3) (emphasis added). "Treatment" is defined as "any method, technique, or process . . . designed to change the . . . character or composition of any hazardous *waste* so as to neutralize such *waste* or so as to render such *waste* nonhazardous, safer for transport, amenable for recovery, amenable for storage, or reduced in volume." 42 U.S.C. § 6903(34) (emphasis added). Thus, A & W disposed of or treated the ore only if it was waste. *See 3550 Stevens Creek Assocs. v. Barclays Bank of Cal.,* 915 F.2d 1355, 1362 (9th Cir.1990). If the ore was a useful product, then it was not waste and not subject to CERCLA. This has been called the useful product defense. *See California v. Summer Del Caribe, Inc.,* 821 F.Supp. 574, 581 (N.D.Cal.1993).

 The district court held that the ore here wasn't a useful product because it couldn't be used in its present state: "In order to extract what A & W alleges to be valuable minerals (gold and silver), the material would have to be subjected to a heap leaching process, which would still leave a by-product requiring disposal." 962 F.Supp. at 1238. But raw materials, by definition, can't be used in their current state. They must be refined-a process which separates the useful portion from the waste. The hard cases occur when a company uses the by-products of its main manufacturing process, or sells them for use by others-i.e., when it uses waste products as the raw material for further processing. *See, e.g., Cadillac Fairview/California, Inc. v. United States,* 41 F.3d 562, 566 (9th Cir.1994); *Louisiana–*

---

9. We note another aspect of the definition of abandonment that the EPA's order ignores. Abandonment is a form of release under section 9601(22), which says release means any spilling, leaking and so on "into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles . . . .)". Any release, including abandonment, must thus be "into the environment." Had A & W left the drums in the middle of the Mojave, with no intent to retrieve them, that would be an abandonment because, over time, there could be a release into the environment. But here the ore was in the hands of the U.S. and Mexican authorities, who had confiscated it. We are hard-pressed to imagine how this could be a release into the environment.

*Pacific Corp. v. Asarco Inc.*, 24 F.3d 1565, 1574–75 (9th Cir.1994). Here, though, the ore wasn't a by-product: It hadn't been processed even once. Smelting unprocessed ore was A & W's business. *See Louisiana–Pacific*, 24 F.3d at 1575 n. 6 (drawing distinction between "products that were produced as the producers' principal business products [and] by-products that the producers had to get rid of.") That the smelting would leave by-products after processing fails to establish that the ore was a by-product or waste.

■ The slag mixed in with the ore complicates the analysis. Slag is indeed a waste by-product; had O2P been only lead-bearing slag, it would have been hazardous waste. But how do we deal with the mix of useful product and waste? Adding waste to an otherwise useful product may make it all waste (e.g. adding a small quantity of lead to a carton of milk) or it may only decrease its usefulness (e.g. adding a small quantity of lead to a bar of gold). It all depends on the materials and their relative quantity. This may look like a repeat of the minimum level requirement question-does a little slag make the whole pile waste? But, the question here isn't whether this material was a hazardous substance-it was. The question is whether the whole pile was waste or a useful product.

If the ore was mixed with enough slag so that it was no longer usable for A & W's principal business, then it was waste. This can be determined by looking both to A & W's actions and to commercial reality. *See Louisiana–Pacific Corp.*, 24 F.3d at 1575. The contract with Roelof for processing suggests the material was a useful product, although A & W's attempt to dispose of the pile in a municipal landfill before contracting with Roelof points the other way. O2P's market value, if any, would also be quite relevant. This is a factual question on which the record is not particularly clear. The EPA orders don't speak to this point. On remand the district court shall consider this issue.

#### "Imminent and substantial endangerment"

■ The EPA may issue an order under section 9606(a) only if it determines there is "an imminent and substantial endangerment to the public health or welfare or the envi-

ronment." CERCLA directs the EPA to establish guidelines for using this power. 42 U.S.C. § 9606(c). Although the EPA has done so, *see* 47 Fed.Reg. 20664 (1982), A & W argues the guidelines do so little guiding that the EPA's actions are arbitrary and capricious, and hence it should be reimbursed. *See* 42 U.S.C. § 9606(b)(2)(D).

Given the minimal rationality required to withstand arbitrary and capricious review, A & W's argument fails. However, the EPA's guidelines are skimpy, and courts must therefore give meaning to "imminent and substantial." In particular, substantial implies that the release must present a more than minimal threat to health, welfare or the environment. However, since A & W has not argued that the release was not a substantial endangerment to health or the environment, we need not resolve that issue here. It remains a question that could be raised on remand.

#### Conclusion

CERCLA gives the EPA broad powers to respond to the improper disposal of hazardous substances. However, those powers aren't quite as broad as the EPA or the district court thought. It is not clear that the ore was waste, nor that all of it was released. The EPA may yet prevail on these issues, but so far summary judgment is premature.

**AFFIRMED** in part, **REVERSED** in part and **REMANDED**. Each party shall bear its own costs.