USCA1 Opinion

 

 United States Court of Appeals For the First CircuitNo. 97-2138 ACUSHNET COMPANY, AMTEL INCORPORATED, AVX CORPORATION, BERKSHIRE HATHAWAY INC., BRIDGESTONE/FIRESTONE, INC., CHAMBERLAIN MANUFACTURING CORP.,  COMMONWEALTH ELECTRICAL COMPANY, COMMONWEALTH GAS COMPANY, EMHART INDUSTRIES, INC., GOODYEAR TIRE & RUBBER CO., PARAMOUNT COMMUNICATIONS INCORPORATED, TELEDYNE RODNEY METALS A DIVISION OF TELEDYNE INDUSTRIES INCORPORATED, AND UNITED DOMINION INDUSTRIES, INC., Plaintiffs, Appellants, v. MOHASCO CORPORATION, MONOGRAM INDUSTRIES INC. D/B/A  AMERICAN FLEXIBLE CONDUIT, NEW ENGLAND TELEPHONE & TELEGRAPH COMPANY, NORTEK, INC., AND OTTAWAY NEWSPAPERS, INC., Defendants, Appellees. APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Robert E. Keeton, U.S. District Judge]  Before Bownes and Cyr, Senior Circuit Judges,  and O'Toole*, District Judge.     Stephen J. Brake, with whom David L. Ferrera and Nutter,McClennen & Fish, LLP were on brief, for appellants. Gerald J. Petros, with whom Charles D. Blackman and Hinckley,Allen & Snyder were on brief, for Monogram Industries and Nortek,Inc., d/b/a American Flexible Conduit, appellees. George W. House, with whom V. Randall Tinsley and Brooks,Pierce, McLendon, Humphrey & Leonard, L.L.P. were on brief, forMohasco Corporation, appellee. Deming E. Sherman, with whom Edwards & Angell, LLP, were onbrief, for Ottaway Newspapers, Inc., appellee. Seth D. Jaffe, with whom Robert S. Sanoff, Jeffrey L. Roelofs,and Foley, Hoag & Eliot, LLP were on brief, for New EnglandTelephone & Telegraph Company, appellee.September 15, 1999  ______________________ *Of the District of Massachusetts, sitting by designation. BOWNES, Senior Circuit Judge. This appeal stems from thecontamination and subsequent clean up of an area popularly known asSullivan's Ledge, located in New Bedford, Massachusetts. Plaintiffs-appellants, collectively known as the Sullivan's LedgeGroup, are thirteen corporations which received notices from theU.S. Environmental Protection Agency ("EPA") advising that thegovernment considered them responsible for the pollution ofSullivan's Ledge under the Comprehensive Environmental Response,Compensation, and Liability Act of 1980 ("CERCLA"). In the early1990's, the group entered into consent decrees with EPA in which itagreed to perform remediation at the site.  Invoking § 9613(f) of CERCLA, the Sullivan's Ledge Groupthereafter filed the present action in federal court seekingcontribution from several parties not targeted by the EPA,including defendants-appellees: Mohasco Corporation; MonogramIndustries Inc. and Nortek Inc., doing business as AmericanFlexible Coduit ("AFC"); New England Telephone & Telegraph Company("NETT"); and Ottaway Newspapers, Inc.  The district court dismissed these contribution claims,granting NETT's motion for summary judgment before trial, andentering judgment as a matter of law for Mohasco, AFC, and Ottawayat the close of plaintiffs' case-in-chief. We affirm, but onsomewhat different grounds than the district court. As weunderstand it, the district court ruled principally that thedefendants deposited so little waste at the site that it could notreasonably be said that they caused plaintiffs to incur responsecosts. To the extent that the court's ruling may be interpreted to incorporate into CERCLA a causation standard that would require a polluter's waste to meet a minimum quantitative threshold, wedisagree. Nevertheless, we conclude that the record wasinsufficient to permit a meaningful equitable allocation ofremediation costs against any of these defendants under § 9613(f). I. Once a pristine and picturesque area well-suited forswimming, hiking, and impromptu gatherings by local residents, overthe years Sullivan's Ledge became little more than an industrialdumping ground for scrap rubber, waste oils, gas, combustion ash,and old telephone poles. Sullivan's Ledge was the source of smokedense enough periodically to obscure the visibility of drivers onnearby roads; residents in the surrounding region commonly blamedthe pollution for diminished air quality. The sludge became sotoxic, the refuse so thick, and the stench so overwhelming, thatcity officials closed down the area in the 1970's. Eventually, the EPA identified a number of businessentities, or their successors-in-interest, which it believed werelegally responsible for the decades-long pollution at the site. In1991 and 1992, after lengthy negotiations, members of theSullivan's Ledge Group entered into two separate consent decreeswith the United States. The decrees required them to implement aremediation plan and, to some extent, shoulder the costs ofrestoring the contaminated site to its non-hazardous state, withoutforeclosing their right to seek contribution from any otherresponsible parties. They duly commenced clean up efforts incompliance with the consent decrees, and, in turn, brought thiscontribution action to recover some portion of the realized andanticipated costs. Plaintiffs accused NETT of dumping the butts of oldtelephone poles that had been treated with liquid creosote chock-full of Polycyclic Aromatic Hydrocarbons ("PAHs"). They allegedthat Nortek and Monogram d/b/a AFC, a manufacturer of conduit andlead-based cable, generated and discarded scrap cable containinglead, copper, and zinc. According to the complaint, New BedfordRayon, the predecessor-in-interest to Mohasco, deposited waste fromthe manufacture of rayon filament thread containing, inter alia,sodium hydroxide, copper, and sulfuric acid. In rounding out thecast of defendants, plaintiffs alleged that The New BedfordStandard Times, the predecessor to Ottaway, generated and disposedof ink sludge bursting with sulfuric acid, nitric acids, andvarious metals.  In due course, NETT moved for summary judgment. AlthoughNETT conceded for purposes of the motion that it had discardedutility pole butts containing PAHs at the site, NETT argued thatits waste added so few PAHs to the mix compared to the overallquantity of PAHs found at Sullivan's Ledge that NETT could notfairly be said to have contributed to the environmental harm or"caused" any of the remediation expenses.  The district court granted the motion during a hearing onJune 11, 1996, (followed by a more extensive opinion issuedJuly 24), ruling that NETT had proffered "uncontradicted experttestimony asserting that NETT did not cause, and, in fact, couldnot have caused the plaintiffs to incur any 'response costs.'"Acushnet Co. v. Coaters Inc., 937 F. Supp. 988, 992 (D. Mass. 1996)("Acushnet I"). Specifically, the district court stated that thisscientific evidence showed that the creosote-treated pole buttscould not have leached PAHs into the soil in an amount greater thanpre-existing background PAH levels and that other sources providedthe overwhelming proportion of PAH found at Sullivan's Ledge. Because, according to the court, plaintiffs failed to adduce anyevidence directly challenging this expert testimony, the courtfound no triable issue of fact as to causation and entered summaryjudgment in favor of NETT.  The remaining defendants proceeded to trial. Upon thecompletion of plaintiffs' case-in-chief, the district courtentertained dispositive motions. Mohasco, AFC, and Ottaway movedfor judgment as a matter of law, arguing in substance that theenvironmental harm at Sullivan's Ledge was divisible and that theevidence was insufficient to permit a finding that the material thedefendants dumped at the site caused any response costs. Ottawayalso argued that plaintiffs had failed to establish that its wasteshad actually been transported to Sullivan's Ledge.  Ruling from the bench on December 2, 1996, the courtdetermined that, viewed in the light most favorable to plaintiffs,the case against each of the three defendants suffered "primarilyfrom insufficiency of the evidence." It found that "the evidencethe plaintiffs proferred against these three defendants . . . is sodramatically below any conceivable appropriate formulation of the[applicable legal] standard, that the outcome of judgment for thesedefendants at this time is clear without resolving just where thoseguidelines will ultimately leave the formulation." The court explained that, at most, plaintiffs hadsucceeded in showing that two cubic yards of solid cable waste wasattributable to AFC, comprising no more than a fraction of the leadand zinc found at Sullivan's Ledge: Looking at AFC as perhaps plaintiffs' best shot among the three, . . . at best, . . . a jury could not find that on an equitable basis, consistent with the Gore factors and with preceden[ts] interpreting the statute, AFC would not be responsible for more than one in 500,000th -- one in 500,000 share, and that that would translate . . . into one hundred dollars. That demonstrates that we're so far below anything that could be classified as an equitable standard of determining shares of legal accountability, that anybody that low, any entity that low, ought to be kept out . . . .For this reason, it concluded that the evidence at trial againstAFC "fails every version one might conceive of an 'equitablefactors' test." Acushnet Co. v. Coaters, Inc., 948 F. Supp. 128,139 (D. Mass. 1996) ("Acushnet II"). As for Mohasco, the court found plaintiffs' evidenceagainst Mohasco even weaker than that against AFC. Not only wasMohasco's apparent share of the hazardous waste far smaller thanplaintiffs' contribution, plaintiffs' own witnesses conceded thatthe types of hazardous substances attributable to Mohasco would not"persist in the environment," and "would not have even reached thesite because of chemical reactions with other materials." Id. In dismissing Ottaway from the litigation, the court saidlittle other than that the case against Ottaway was "obviouslyweaker than plaintiffs' case against . . . either of these [other]two defendants."  Lest there be any doubt, the trial judge reiterated thatthe Sullivan's Ledge Group's claims against these three defendantsfailed "on two independent grounds": first, the evidence wasinsufficient to bring AFC, Mohasco, and Ottaway within the groupfor which "the calculus of appropriate proportional shares" ofliability for response costs could be made "and, secondly, ongrounds of a lack of showing of causal connection with respect toremediation costs." See also Acushnet II, 948 F. Supp. at 139.  The district court entered judgment accordingly.Plaintiffs now appeal from each of the court's rulings. II. CERCLA, as we have said on other occasions, sketches thecontours of a strict liability regime. See, e.g., Millipore Corp.v. Travelers Indem. Corp., 115 F.3d 21, 24 (1st Cir. 1997). Broadcategories of persons are swept within its ambit, including thecurrent owner and operator of a vessel or facility; the owner oroperator of a facility at the time hazardous waste was disposed of;any person who arranged for the transportation of hazardoussubstances for disposal or treatment; and anyone who acceptedhazardous waste for transportation. See 42 U.S.C. § 9607(a)(1)-(4). There are a few affirmative defenses available, see§ 9607(b), but they are generally difficult to satisfy (theyinclude showing that the release or threat of release was causedsolely by an act of God or an act of war). By and large, a personwho falls within one of the four categories defined in § 9607(a) isexposed to CERCLA liability. While CERCLA casts the widest possible net overresponsible parties, there are some limits to its reach. Thecourts of appeals have generally recognized that "although jointand several liability is commonly imposed in CERCLA cases, it isnot mandatory in all such cases." In re Bell Petroleum Servs.,Inc., 3 F.3d 889, 895 (5th Cir. 1993) (discussing import ofdeletion of joint and several liability language from final versionof bill); see United States v. Alcan Aluminum Corp., 964 F.2d 252,268 (3d Cir. 1992) ("Alcan I"). In O'Neil v. Picillo, 883 F.2d 176 (1st Cir. 1989), weembraced the Restatement (Second) of Torts approach in construingthe statute, stating that a defendant may avoid joint and severalliability if the defendant demonstrates that the harm is divisible. In that event, damages should be apportioned according to the harmto the environment caused by that particular tortfeasor. Id. at178-79; accord Dent v. Beazer Materials and Servs., 156 F.3d 523,529 (4th Cir. 1998); United States v. Township of Brighton, 153F.3d 307, 317-18 (6th Cir. 1998); United States v. Alcan AluminumCorp., 990 F.2d 711, 722 (2d Cir. 1993) ("Alcan II"); Alcan I, 964F.2d at 268-70. See generally Restatement (Second) of Torts § 433A(1965).  A responsible party, in turn, may bring an action forcontribution under § 9613(f) to recover a portion of costs from"any other person who is liable or potentially liable under§ 9607(a)." The standard for contribution liability is the same asthat under § 9607(a), see Prisco v. A&D Carting Corp., 168 F.3d593, 603 (2d Cir. 1999), but in resolving contribution claims, acourt may, in its discretion, "allocate response costs among liableparties using such equitable factors as the court determines areappropriate." § 9613(f)(1).  A plaintiff seeking contribution must prove that:  1. The defendant must fall within one of four categories of covered persons. 42 U.S.C. § 9607(a). 2. There must have been a "release or threatened release" of a hazardous substance from defendant's facility. 42 U.S.C.  § 9607(a)(4); § 9601(14), (22). 3. The release or threatened release must "cause[] the incurrence of response costs" by the plaintiff. 42 U.S.C. § 9607(a)(4). 4. The plaintiff's costs must be "necessary costs of response . . . consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B); § 9601(23)-(25).Dedham Water Co. v. Cumberland Farms Dairy, 889 F.2d 1146, 1150(1st Cir. 1989) ("Dedham I"). Generators whose waste has been deposited in the facilityfrom which there has been a release are presumptively responsiblefor the response costs, subject to the opportunity to prove(i) that the harm was solely caused by someone (or something) else(see § 9607(b)) or (ii) that the harm they caused is divisible (seeO'Neil, 883 F.2d at 179), and subject further to the equitableallocation of relative shares of responsibility in an action forcontribution (see § 9613(f)(1)). The parties do not dispute that Sullivan's Ledge is a"facility" or that each of the defendants was a responsible personwithin the meaning of § 9607(a). Instead, they hotly contest thecorrect legal standard by which one could be said to have "caused"plaintiffs to incur remediation expenditures, and whether therecord was adequate to allow any meaningful award of responsecosts. III. The Sullivan's Ledge Group mounts a three-fold attack onthe district court's reasoning in resolving the respective motions. Its arguments on appeal are broad-brushed in nature, focusingalmost entirely on the legal meaning of "causation" and CERCLA'sunderlying policy goals. First, plaintiffs insist that reading anycausal element into CERCLA is inconsistent with the principle ofstrict liability. Second, they contend that doing so would runcounter to the remedial purpose of CERCLA because, among otherthings, it will let smaller polluters off the hook and discourageresponsible parties from entering into consent agreements with thegovernment. Third, to the extent the district court may haveconsidered equitable factors in ruling in favor of Mohasco,Ottaway, and AFC, plaintiffs claim that the court did so withoutproviding a "full and fair allocation trial" within the meaning ofsection 9613(f).  Defendants-appellees, for their part, contend that itmakes sense to say that a de minimis polluter has not caused aresponsible party to incur clean up costs; and that, in all events,plaintiffs' contribution claims against them founder for a morefundamental reason: the record did not permit a finding that eachshould bear a meaningful share of the costs associated withrestoring Sullivan's Ledge. In their view, these fatal weaknessesin the plaintiffs' case justified judgment as a matter of law intheir favor. Each of the defendants stands on slightly differentterrain, having been dismissed from the action at various stages inthe proceedings. We therefore proceed to analyze plaintiffs'arguments within the context of addressing the trial court'sdisposition of the claims lodged against each defendant.  We affirm the district court's handling of NETT's summaryjudgment motion, albeit based on a slightly different rationale thanthe court's own. Although the court initially framed it in termsof causation (erroneously, we believe), a finding of no liabilityon the part of NETT is nevertheless justified under the principleof equitable allocation under § 9613(f). We have strong reservations about interpreting thestatute's causation element to require that a defendant beresponsible for a minimum quantity of hazardous waste beforeliability may be imposed. The text of the statute does not supportsuch a construction -- CERCLA itself does not expressly distinguishbetween releases (or threats of releases) by the quantity ofhazardous waste attributable to a particular party. At least on itsface, any reasonable danger of release, however insignificant, wouldseem to give rise to liability. On this point, the courts ofappeals are in unison. See, e.g., A&W Smelter and Refiners, Inc.v. Clinton, 146 F.3d 1107, 1110 (9th Cir. 1998); Alcan II, 990 F.2dat 720; Alcan I, 964 F.2d at 260-63; Amoco Oil Co. v. Borden, Inc.,889 F.2d 664, 669 (5th Cir. 1990); see also 42 U.S.C. § 9601(14)(defining "hazardous substance" without mentioning minimum levels);§ 9607(a) (employing broad "any person" language).  To read a quantitative threshold into the language "causesthe incurrence of response costs" would cast the plaintiff in theimpossible role of tracing chemical waste to particular sources inparticular amounts, a task that is often technologically infeasibledue to the fluctuating quantity and varied nature of the pollutionat a site over the course of many years. Moreover, it would be extremely difficult, if notimpossible, to articulate a workable numerical threshold in definingcausation. How low would a polluter's contribution to the mix haveto be before a judge could find, with equanimity, that the polluterwas not a but-for "cause" of the clean up efforts? Less than 0.5%or 1%? We do not see how such a line, based on the quantity orconcentration of the hazardous substance at issue, can be drawn ona principled basis in defining causation. To even begin down thatpath, we feel, is to invite endless confusion. Our own decisions provide no basis for such an approach. There is only one case in which we held that clean up efforts werenot carried out because of a defendant's dumping: where a watertreatment plant had been designed well before its planners acquiredknowledge that the defendant might have released hazardous wasteinto the environment. We found that, to the extent that theplaintiff incurred costs in connection with the planning and designof the treatment facility before it became aware of possiblepollution by the defendant, it had not responded to any threatenedfuture releases, but had only spent money to address the actualcontamination of the site. Accordingly, we held in Dedham II thatsuch expenditures were not "caused" by a threatened release from thedefendant's facility. See 972 F.2d at 460-61.  That, however, is the only situation in which we havefound an insufficient causal nexus between a defendant and theremediation expenditures. And we have never discussed CERCLAcausation in quantitative terms. To satisfy the causal element, itis usually enough to show that a defendant was a responsible partywithin the meaning of 9607(a); that clean up efforts were undertakenbecause of the presence of one or more hazardous substancesidentified in CERCLA; and that reasonable costs were expended duringthe operation. To the extent that the district court held thatsome minimal quantity of hazardous waste must be involved before adefendant may be held to have "caused" the expenditure of responsecosts, it was mistaken. See O'Neil, 883 F.2d at 179 n.4 (expresslyrejecting, in a related context, the argument that one mustdemonstrate that defendant was a "substantial" cause of thecontamination before CERCLA liability attaches).  This does not mean, however, that the de minimis pollutermust necessarily be held liable for all response costs. Theapproach taken by the Second Circuit is instructive. In Alcan II,990 F.2d 711 (2d Cir. 1993), the Second Circuit reaffirmed theRestatement (Second) of Torts approach to fleshing out the scope ofCERCLA liability, holding that where environmental harms aredivisible, a defendant may be held responsible only for hisproportional share of the response costs. In extending theprinciple a half-step, the Second Circuit went on to say that:  [A defendant] may escape any liability for response costs if it either succeeds in proving that its [waste], when mixed with other hazardous wastes, did not contribute to the release and cleanup costs that followed, or contributed at most to only a divisible portion of the harm.Id. at 722. The court emphasized that this particular defense waslimited to situations where a defendant's "pollutants did notcontribute more than background contamination and also cannotconcentrate." Id. It acknowledged that causation was, in somesense, "being brought back into the case  through the backdoor,after being denied entry at the frontdoor  at the apportionmentstage." Id. Nevertheless, the court concluded that a defendant whosuccessfully meets its burden can "avoid liability or contribution." Id. at 725. The Alcan II panel took great pains to leave questionsof liability, including the divisibility of environmental harm, andequitable apportionment of clean up expenses, to the sounddiscretion of the trial judge to be handled in the manner and orderhe or she deems best. Id. at 723. We think the Second Circuit hadit right.  We therefore hold that a defendant may avoid joint andseveral liability for response costs in a contribution action under§ 9613(f) if it demonstrates that its share of hazardous wastedeposited at the site constitutes no more than background amountsof such substances in the environment and cannot concentrate withother wastes to produce higher amounts. This rule is not based onCERCLA's causation requirement, but is logically derived from§ 9613(f)'s express authorization that a court take equity intoaccount when fixing each defendant's fair share of response costs. We caution, however, that not every de minimis polluter will eludeliability in this way. As always, an equitable determination mustbe justified by the record. There are several reasons why, after all is said and done,an otherwise responsible party may be liable for only a fraction ofthe total response costs or escape liability altogether. In thefirst place, § 9613(f) expressly contemplates that courts will takeequity into account in resolving contribution claims. We have inthe past suggested that while a defendant in a direct EPAenforcement action invoking the divisibility of harm defense bearsan "especially heavy burden," a defendant in a contributionproceeding seeking to limit his liability has a "less demandingburden of proof" by virtue of the equitable considerations that comeimmediately into play. In re Hemingway Transp., Inc., 993 F.2d 915,921 n.4 (1st Cir. 1993); see also O'Neil, 883 F.2d at 183 (statingthat a defendant's burden is "reduced" in a contribution action). A court, in evaluating contribution claims under § 9613(f), is "freeto allocate responsibility according to any combination of equitablefactors it deems appropriate." O'Neil, 883 F.2d at 183. Accord FMCCorp. v. Aero Indus., Inc., 998 F.2d 842, 846-47 (10th Cir. 1993);Environmental Transp. Sys., Inc. v. ENSCO, Inc., 969 F.2d 503, 509(7th Cir. 1992). In an appropriate set of circumstances, atortfeasor's fair share of the response costs may even be zero. SeePMC, Inc. v. Sherwin-Williams Co., 151 F.3d 610, 616 (7th Cir. 1998)(a party's "spills may have been too inconsequential to affect thecost of cleaning up significantly, and in that event a zeroallocation would be appropriate") (Posner, J.), cert. denied, 119S. Ct. 871 (1999); O'Neil, 883 F.2d at 183 (same). In the second place, there is nothing to suggest thatCongress intended to impose far-reaching liability on every partywho is responsible for only trace levels of waste. Several courts,albeit taking different paths to a similar result, have rejected thenotion that CERCLA liability "attaches upon release of any quantityof a hazardous substance." Licciardi v. Murphy Oil USA, 111 F.3d396, 398 (5th Cir. 1997) (quoting Amoco Oil, 889 F.2d at 670)(emphasis in original; see e.g., PMC, 151 F.3d at 616; Gopher OilCo. v. Union Oil Co. of Cal., 955 F.2d 519, 527 (8th Cir. 1992). Third, allowing a CERCLA defendant to prevail on issuesof fair apportionment, even at the summary judgment stage, isconsistent with Congress's intent that joint and several liabilitynot be imposed mechanically in all cases. Permitting a result thatis tantamount to a no-liability finding is in keeping with thelegislative goal that clean up efforts begin in a speedy fashion andthat litigation over the details of actual responsibility follow. In fact, to require an inconsequential polluter to litigate untilthe bitter end, we believe, would run counter to Congress's mandatethat CERCLA actions be resolved as fairly and efficiently aspossible. On the whole, the costs and inherent unfairness insaddling a party who has contributed only trace amounts of hazardouswaste with joint and several liability for all costs incurredoutweigh the public interest in requiring full contribution from deminimis polluters.  Plaintiffs complain that any consideration of causationis at odds with CERCLA's objectives and would discourage responsibleparties from entering into consent decrees. Because we ground thequantum inquiry solidly in § 9613(f), we are satisfied theirprophesy will not come to pass. The ultimate failure of acontribution claim because someone did only a negligible amount ofharm does not impede enforcement by the EPA or frustrate any ofCERCLA's objectives.  A. Relying on favorable case law from the Second and ThirdCircuits, NETT attempted to prove that it contributed only traceamounts of hazardous waste to Sullivan's Ledge. At the summaryjudgment stage, once a movant has offered evidence showing thatthere is no dispute as to any material fact and that he is entitledto judgment as a matter of law, the non-moving party must comeforward with sufficient evidence to create a triable issue of fact;if he fails to do so, that is the end of the matter. See Fed. R.Civ. P. 56.  In its motion for summary judgment, NETT contended that"it is beyond material dispute that no wastes disposed of by [NETT]. . ., even when considered with wastes disposed by other persons,could have contributed to the environmental harm at the Site or tothe incurrence of response costs" and therefore "such wastes cannotbe the basis for the imposition of any liability" upon it. As themoving party, NETT undertook the burden of satisfying the court thatits motion ought to be granted.  It offered extensive expert evidence to the effect thatthe concentration of PAHs from NETT telephone poles, if in fact suchpoles were left at the site, was negligible. In a series ofreports, Dr. John Tewhey estimated that some 335,000 pounds of PAHswere disposed of at Sullivan's Ledge, confirmed that the Sullivan'sLedge Group was responsible for most of this pollution, and statedthat PAHs from telephone pole butts could have added no more thannegligible amounts to existing PAHs in the surrounding region. Hestated that PAH levels in soil samples from areas near where utilitypoles were located revealed the same amount of PAH found in manypopular foods. We have already rejected the district court's reasoninginasmuch as it may have been rooted in a theory of causation thatrequired some quantitative threshold. But even if NETT may be saidto have caused plaintiffs to incur response costs, plaintiffs failedto rebut NETT's evidence showing that it should bear no more thana de minimis share of the remediation expenditures under § 9613(f). NETT essentially offered evidence tending to show that its equitableshare would amount to zero; plaintiffs gave only a non-responsiverejoinder, mostly by insisting (wrongly) that causation isirrelevant.  Questions of causation and appropriate equitableallocation of response costs involve quintessential issues of fact. See Dedham II, 972 F.2d at 457. But we see nothing especiallyonerous about requiring the Sullivan's Ledge Group to come forwardwith admissible evidence where a defendant has fairly raised theissues. See Amoco Oil, 889 F.2d at 667-68 (approving use of summaryjudgment to hone trial-worthy issues in multi-defendant CERCLAcases). All that need be done to survive that stage is to submitadmissible evidence sufficient to point up a factual dispute. Itis no different than asking a plaintiff to proffer some evidence asto damages where a defendant has claimed in summary judgment papersthat the plaintiff has, in fact, suffered no compensable harm. Given the Sullivan's Ledge Group's failure to meet its burden inthis regard, the trial court properly entered judgment for NETT.  We turn now to the district court's rulings in favor ofAFC, Mohasco, and Ottaway. B. As a threshold matter, there is some slight confusion asto whether the trial judge's decision for these defendants was basedon Rule 50 (judgment as a matter of law) or Rule 52 (findings offact and conclusions of law after a bench trial). On the one hand,he explicitly stated that he was viewing the evidence in the lightmost favorable to the plaintiffs, the usual standard for Rule 50motions; he also impaneled a jury to resolve certain factualmatters, raising the added question whether Rule 52 would even beappropriate. See Fed. R. Civ. P. 52(a) (applicable to actions"tried upon the facts without a jury or with an advisory jury"). On the other hand, the judge also spoke in terms of making "findingsof fact and conclusions of law."  Although the court flirted with the prospect of enteringjudgment by way of Rule 52 (saying, "whichever way I went about it,it would come about the same"), we think it sufficiently clear thatthe court intended to employ judgment as a matter of law as itsprincipal lens for viewing plaintiffs' claims. See App. at 05812("I am calling them Rule 50 judgments."). Because we conclude thatthe trial judge engaged the gears of Rule 50, we scrutinize hislegal conclusions de novo. Plaintiffs' evidence must be viewed inthe light most favorable to them, and all reasonable inferences fromthe record must be drawn to their advantage. See Koster v. TransWorld Airlines, Inc., __ F.3d __, No. 98-1757, 1999 WL 396023, at*2 (1st Cir. June 21, 1999).  We affirm the judgment on the basis that the evidence wasinadequate to permit a rational factfinder to make a quantifiableallocation of response costs to AFC, Mohasco, or Ottaway under§ 9613(f). See Hodgens v. General Dynamics Corp., 144 F.3d 151,173 (1st Cir. 1998) ("We will affirm a correct result reached by thecourt below on any independently sufficient ground made manifest bythe record."). While no precise allocations were made in this case, atrial court's perspective is nevertheless instructive as to theequitable considerations most relevant to the dispute at hand. Here, the court found the respective quantities of hazardousmaterials attributable to each defendant, the toxicity of therespective wastes, and their durability to be highly relevant tofixing an equitable share. Within this general framework, the courtassessed the Sullivan's Ledge Group's evidence and found itinadequate. We agree.  Plaintiffs' evidence at trial tended to show that AFC wasresponsible for hazardous waste at Sullivan's Ledge on a scale"thousands of times less than the remaining contribution of others";that, in terms of sheer mass, the two cubic yards of solid wasteattributable to AFC constituted an insignificant amount of pollutionwhen compared to over one million cubic yards of waste found atSullivan's Ledge; that the remediation plan was largely driven bythe presence of hazardous substances other than copper and zinc; andthat the materials attributable to AFC was not as toxic as the othersubstances discovered at the site, namely, PAHs, Volatile OrganicCompounds, and Polychlorinated Biphenyls. Taking at face valueplaintiffs' own estimates of the costs of remediation, AFC's shareof response costs, in the most generous formulation, would amountto no more than 1/500,000 of $50 million amounting to less than$100.  Two main factors underlay the trial court's ruling infavor of Mohasco: (1) Plaintiffs' evidence against Mohasco was farweaker than that against AFC; and (2) undisputed scientifictestimony by plaintiffs' own experts that hazardous substancesattributed to Mohasco "would not persist in the environment."  As for Ottaway, beyond the small amount of materialattributable to its predecessor-in-interest, The New BedfordStandard Times, plaintiffs' evidence actually linking The NewBedford Standard Times to the ink waste at Sullivan's Ledge was thinat best. On appeal, plaintiffs make no real effort to challenge thecourt's characterization of their evidence or of each defendant'sapparent equitable share of the clean up expenditures. Eschewinga direct attack on the factual bases for the court's ruling, theyinstead make a series of arguments aimed at the court's legalreasoning and the general format of the proceedings. They first suggest that equitable determinations playedno role in the court's decision and therefore provide an inadequateground for affirmance. Even a cursory examination of the recordputs this argument to rest. The court repeatedly referred to theequitable factors it found most salient, and discussed the weightof the evidence as to each of these factors. While the judge wasnot making specific allocations, it is plain to us he was holdingthat, in light of the equitable factors he would apply should hemake explicit findings, plaintiffs' evidence showed too littlepollution to justify compelling defendants to take on any meaningfulshare of the response costs. We read him to say that if he had tomake an allocation for AFC, Mohasco, and Ottaway, the evidencedictated that each of their shares for response costs would be zero. The court's reasoning is therefore sufficiently transparent as toprovide a basis for affirmance. We add that, even if the trialcourt's explanations were less than lucid (which they are not), wewould still have the power to affirm on any ground apparent on theface of the record. See Mesnick v. General Elec. Co., 950 F.2d 816,822 (1st Cir. 1991) ("An appellate panel is not restricted to thedistrict court's reasoning but can affirm a summary judgment on anyindependently sufficient ground."). Plaintiffs next argue that the trial court erroneouslypresumed them liable for response costs in violation of 42 U.S.C.§ 9622(d)(1)(B) (providing that execution of consent decree inconnection with CERCLA enforcement "shall not be considered anadmission of liability"). This, they argue, improperly imposed onplaintiffs a burden they should not have been required to bear,namely, that of proving their own non-liability. This argument,too, is easily rejected. The judge made it perfectly clear that allof the parties were starting "on equal ground," that he "was notassuming that anybody has any special burdens in this case," andthat he was "not drawing [an adverse] inference" from the consentdecrees. Although the court did mention the "fundamental principle"that injuries be left where they lie unless judicial interventionis warranted, that is simply another way of saying that plaintiffsat all times had the burden of proving their contribution claims.  There is one final matter to be untangled. The Sullivan'sLedge Group suggests that insofar as the trial judge purported tomake equitable findings under § 9613(f), it did so prematurely. Plaintiffs insist that a remand is warranted so that a full and fairhearing may be held before the court can accurately allocate theresponse costs among each of the liable parties.  We are aware that a specific allocation cannot logicallybe made until a defendant has been deemed liable as a responsibleparty, for contribution may only be obtained from joint tortfeasors. Nevertheless, we are mindful of the complex nature of these kindsof lawsuits. District courts have considerable latitude to dealwith issues of liability and apportionment in the order they see fitto bring the proceedings to a just and speedy conclusion. See AlcanII, 990 F.2d at 723. CERCLA does not demand a bifurcated trial onthis score, nor have we insisted that the many knotty issues thatarise in the typical CERCLA action be resolved in any particularchronological order. On this record, we find no abuse of discretion in thecourt's failure to make more detailed findings or to hold a separateallocation hearing. Nothing in the record suggests that plaintiffscomplained about the unified nature of the § 9613(f) proceedings. If plaintiffs felt truly hampered by the structure of the trial,they should have interposed a timely objection. We also think ittelling that they make no effort to describe the additional materialit would present to the trial judge were we to order a remand. Wewill not order a remand when it is likely to be an empty exercise. Finally, the fact that the court received the Sullivan's LedgeGroup's evidence over the course of seventeen days convinces us thatplaintiffs had every opportunity to submit any and all relevantevidence at its disposal on the issues of liability and equitableapportionment. Affirmed. Costs awarded to defendants-appellees.